## IN THE SUPREME COURT OF THE STATE OF IDAHO
### Docket No. 38549

| | |
|---|---|
| HABIB SADID, ) | |
| ) | Pocatello, November 2012 Term |
| Claimant-Appellant, ) | |
| ) | 2013 Opinion No. 11 |
| v. ) | |
| ) | Filed: January 24, 2013 |
| IDAHO STATE UNIVERSITY, Employer, ) | |
| and IDAHO DEPARTMENT OF LABOR, ) | Stephen W. Kenyon, Clerk |
| ) | |
| Respondents. ) | |

_____

Appeal from the Idaho Industrial Commission.

The findings of the Industrial Commission are <u>affirmed</u>. Costs on appeal are awarded to Respondent.

Camacho Mendoza Coulter Law Group, PLLC, Eagle, attorneys for Appellant. Ronaldo A. Coulter argued.

Hon. Lawrence Wasden, Idaho Attorney General, Boise, attorneys for Respondent.

Racine, Olson, Nye, Budge & Bailey, Chtd, Pocatello, attorneys for Employer/ Respondent. John A. Bailey argued.

_____

W. JONES, Justice

### I. NATURE OF THE CASE

Appellant, Habib Sadid, a former tenured professor of civil engineering at Idaho State University, appeals the Industrial Commission's Order reversing the Department of Labor Appeals Examiner's grant of unemployment benefits to Sadid after Sadid was terminated by Idaho State University.

### II. FACTUAL AND PROCEDURAL BACKGROUND

Professor Habib Sadid was a tenured professor of civil engineering at Idaho State University ("ISU"). ISU is a government entity. I.C. § 33-3003. In the years preceding Sadid's dismissal from ISU, he became openly critical of ISU, and expressed his concerns related to ISU in Idaho newspapers. On September 29, 2008, Sadid filed a complaint alleging ISU unlawfully

retaliated against him in violation of his First Amendment rights. *See Sadid v. Idaho State Univ.*, 151 Idaho 932, 265 P.3d 1144 (2011).

After filing his retaliation claim against ISU, Sadid continued to be openly critical of ISU and its administrators. His allegations of unethical and criminal conduct were frequently made in public, and in widely distributed emails sent to ISU's upper administration and the entire faculty of the College of Engineering. On April 6, 2009, after Sadid accused Dean Jacobsen of manipulating the minutes of faculty and chair meetings,[1] his department chair, Dr. Zoghi, sent a letter to Sadid. In it, Dr. Zoghi informed Sadid that his "questioning of the Dean's honesty and the administrative assistant's integrity, and judgment, via widely distributed e-mail messages, are outside the bounds of professionalism and are disruptive." Dr. Zoghi further instructed Sadid that "In the future, you are directed to follow proper protocol in expressing your concerns (first to the Chair . . . , then to the Dean . . . , then to Idaho State University's upper administration)."

---

[1] This was not the first time that Sadid accused ISU administrators and professors of unethical conduct in public or widely distributed emails:

In October of 2008, Sadid expressed concern about being excluded from an event to greet incoming honor students. Of this mishap, Sadid said "[t]his is not a big issue," but used it to question Dean Jacobsen's leadership ability, administrative ability, and ethics. Sadid alleged retaliation for his first lawsuit against ISU, and copied his lawyer, and ISU's upper administration.

In November of 2008, Sadid alleged wrongdoing by department chairs regarding the assignment of graduate teaching assistants on funded faculty research projects. Dean Jacobsen informed Sadid that, after investigation, there was no evidence of teaching assistants working on funded research projects. He provided a clarification of the instruction manual and informed Sadid that if he had additional concerns, or other specific information, Sadid should discuss it with him in person. In Sadid's response to Dean Jacobsen (in which he copied ISU's upper administration) he alleged that "[m]isuse of authorities, misjudgments of administration, cronyism, empire building by the administration are violations we see daily . . . ."

On January 14, 2009, in response to a mass email request for nominations for the "2009 Professional Achievement Award," Sadid replied to the College of Engineering faculty and ISU's upper administration publically challenging a colleague's qualifications to coordinate an event called MATHCOUNT. According to Sadid, this was apparently demonstrative of Dean Jacobsen's "destroying this college by misusing his power and not respecting the faculty."

On March 16, 2009, at a faculty meeting, he challenged Dean Jacobsen's performance. In an email copied to the whole faculty of the College of Engineering, Sadid again questioned Dean Jacobsen's performance; characterized the department chairs as not knowing what they are doing; and accusing Dean Jacobsen of manipulating the meeting minutes from a March 16, 2009 meeting. Less than two hours later, Sadid *again* sent an email to the entire College of Engineering faculty, and ISU's upper administration, accusing Dean Jacobsen of "dictating the minutes of [the] faculty meeting" and the chairs meeting. He further called Dean Jacobsen untrustworthy and charged recipients to record meetings. He also suggested the recordings would be needed in court.

On April 22, 2009, Associate Professor Vitit Kantabutra wrote an email to Provost Olson about the "over-the-top offensive behavior of my good friend and colleague Dr. Habib Sadid."

On June 4, 2009, Sadid allegedly approached a staff member alleging that Dean Jacobsen lied under oath. One week later, Sadid sent an email to the College of Engineering faculty containing cartoons about lying under oath.

On April 9, 2009, at a public faculty awards reception, Sadid confronted Dean Jacobsen about issues allegedly including his evaluation, and his intent to imprison Dean Jacobsen for reasons not clear from the record. Following that incident, Dean Jacobsen sent a letter to Sadid in which he informed Sadid that his behavior was unprofessional and that he "should not use such channels as campus-wide meetings, engineering faculty meetings, and widely distributed email communications to make negative comments about . . . university staff and employees." Dean Jacobsen further informed Sadid that his behavior was "disruptive and detrimental to the image of [Sadid's] department, the college, and the university." Sadid was advised that in the future he should "observe collegiality in the workplace" and he must follow ISU's protocols when expressing his concerns, or face disciplinary action.

Yet, after these two warnings, Sadid continued to allege misconduct. The College of Engineering held a faculty meeting on April 21, 2009, which was attended by Provost Olson and all faculty and staff of the College of Engineering. Throughout the meeting, lasting more than two hours, Sadid repeatedly accused current and former administrators of misconduct. He questioned Dean Jacobsen's performance. Sadid also raised issues related to his job performance evaluation, with which he disagreed.[2] Following the faculty meeting, Dean Jacobsen issued a

---

[2] At the start of the meeting, Dean Jacobsen addressed the need to create a uniform faculty workload policy. Sadid mentioned that he believed that there were no workload policies and they were completely subjective. Professor Imel challenged this characterization of Sadid's and asked Sadid what policies he utilized when Sadid was chair. After Imel challenged Sadid to produce a standard, Sadid, by his own account, stood up to leave the meeting to produce his standards. Sadid also challenged Professor Imel's experience at ISU and his experience generally. Imel pointed out to Sadid that he has been at ISU longer than Sadid, and defended his experience.

Sadid then addressed the necessity of a uniform faculty workload policy and raised concerns about his personal evaluation by Dr. Zoghi. Dean Jacobsen told Sadid that he was not going to talk about his personal evaluation in a faculty meeting. Sadid persisted and questioned how Dr. Zoghi evaluated him. During this conversation, a new faculty member said it was inappropriate to discuss Sadid's personal concerns during a faculty meeting. Sadid then questioned the role of the dean and began another tirade about the ineffectiveness of Dean Jacobsen. Provost Olson then arrived at the meeting. Professor Ellis, continuing on Sadid's tirade, then questioned the Provost about Dean Jacobsen's performance. Sadid entered into another tirade regarding his performance. He then questioned the Provost whether he would communicate with the faculty because the administration was corrupt; to which the Provost said he would. Sadid repeated his question again.

After Provost Olson left the meeting, Dean Jacobsen expressed his frustration over the faculty's behavior with the Provost. He said that it was the first time he had ever heard of such conduct. Sadid used this as an opportunity to, again, challenge the administration. After heated discussion, Jacobsen attempted to get the meeting back on track by encouraging the faculty to work together, and stop undermining each other. Sadid again expressed his concern that the college used to be good, but was in much worse shape then it used to be, because meetings were held behind closed doors and without faculty involvement.

At that point, a staff member broke into tears and expressed how much she hated this conflict and would leave ISU if she could. Sadid, blamed the staff member's discomfort on leadership—a point the staff member expressly disagreed with. Sadid continued to express his frustrations with leadership and chairs who were unethical "power hungers." He then expressed frustration that he was not made chair of his department. He stated that he had better accomplishments then the current chairs, and would be better suited to be a chair. Because of that, he

---

3

Notice of Contemplated Action ("NOCA") on May 6, 2009. The NOCA notified Sadid that his conduct at the faculty and staff meeting was "unprofessional, non-collegial, disruptive, and insubordinate. Because that conduct represents a continued pattern of behavior . . . I am considering recommending your dismissal for adequate cause." Dean Jacobsen relied on Sadid's disruption in disregard of the meeting agenda; his discussion of his personal evaluation, even after being informed the meeting was not the proper forum to raise such concerns; and his persistent allegations of corruption and misconduct. Dean Jacobsen informed Sadid that the College of Engineering could not move forward so long as he made "defamatory" statements, which were unprofessional and disruptive. The NOCA, however, invited Sadid to meet with Dean Jacobsen to discuss the contemplated action.

While ISU's action against Sadid was pending, Sadid accused Dean Jacobsen of lying under oath, confronted a staff member with this accusation, and distributed email cartoons on the matter to the entire faculty of the College of Engineering. During this time, Sadid made unauthorized purchases. When told by ISU's upper administration to cease unauthorized purchases, Sadid's attorney accused ISU of retaliation, because whether Sadid made unauthorized purchases was a "minor issue." After a hearing before a faculty panel, the panel recommended that President Vailas not dismiss Sadid on the grounds that he lacked adequate due process. President Vailas rejected the recommendation and terminated Sadid.

Following his termination, Sadid applied for unemployment benefits. In a hearing before the Department of Labor Appeals Examiner, from which ISU was absent, Sadid was awarded benefits. ISU appealed the Appeals Examiner's decision to the Industrial Commission ("Commission"). The Commission reversed the Appeals Examiner, and found that Sadid was dismissed for employment-related misconduct. The Commission held that Sadid's subjective state of mind was irrelevant and that he was told to observe proper protocol by ISU. Sadid requested reconsideration by the Commission, which was granted on the basis that an audio recording of the April 21, 2009, meeting should have been considered. After reviewing the audio recording, the Commission reaffirmed its determination that Sadid was terminated for employment-related misconduct. Sadid appealed to this Court, asserting that the Commission

questioned the integrity and honesty of the administration. Jacobsen asked Sadid to find a way to co-exist peacefully. Sadid then challenged whether Jacobsen was working with faculty. After Jacobsen transitioned to the College Dismissal Policy, Sadid challenged Jacobsen on the administration's failure to raise money. The meeting concluded after two hours and seventeen minutes.

erred in concluding Sadid committed misconduct, and its determination that academic freedom had no bearing on its decision.

### III. ISSUES ON APPEAL

1. Whether the Commission erred when it concluded that Sadid's conduct at the April 21, 2009, faculty meeting constituted employment-related misconduct for purposes of unemployment benefits.

2. Whether the Industrial Commission erred in not considering whether Sadid's actions were protected by the First Amendment.

### IV. STANDARD OF REVIEW

On an appeal from the Industrial Commission, the Industrial Commission's determination that an employee's actions constituted misconduct will be upheld if supported by substantial and competent evidence. *Rigoli v. Wal-Mart Assocs. Inc.*, 151 Idaho 707, 710, 262 P.3d 761, 764 (2011); *Giltner, Inc. v. Idaho Dep't of Commerce & Labor*, 145 Idaho 415, 418, 179 P.3d 1071, 1074 (2008). "Evidence that is substantial and competent is relevant evidence that a reasonable mind might accept to support a conclusion." *Rigoli*, 151 Idaho at 710, 262 P.3d at 764. This Court exercises free review over the Commission's legal conclusions. *Giltner*, 145 Idaho at 418, 179 P.3d at 1074. This Court will not reweigh the evidence, or consider whether a different conclusion could be drawn. *Id.* "All facts and inferences will be viewed by the Court in a light most favorable to the prevailing party before the Commission." *Rigoli*, 151 Idaho at 710, 262 P.3d at 764.

### V. DISCUSSION

**A.    The Commission's finding of misconduct is supported by substantial and competent evidence.**

The first issue is whether Sadid's conduct constitutes misconduct under I.C. § 72-1366 sufficient to warrant a denial of unemployment benefits. An employer may challenge the grant of unemployment benefits on the ground that employment was terminated for misconduct. I.C. § 72-1366(5) (restricting unemployment benefits to situations where "[t]he claimant's unemployment is not due to the fact that he left his employment voluntarily without good cause connected with his employment, or that he was discharged for misconduct in connection with his employment."); *Beaty v. City of Idaho Falls*, 110 Idaho 891, 892, 719 P.2d 1151, 1152 (1986). "[T]he employer must carry the burden of proving that the employee was in fact discharged for employment-related misconduct." *Roll v. City of Middleton*, 105 Idaho 22, 25, 665 P.2d 721, 724

(1983). Whether an employer had reasonable grounds to discharge an employee, and whether those grounds constitute misconduct are two "separate and distinct" issues. *Beaty*, 110 Idaho at 892, 719 P.2d at 1152.

> Misconduct as used in Idaho Code § 72-1366(5) . . . [includes] a disregard of the employer's expected standard of behavior . . . . Standard of behavior cases follow a two-pronged test, finding first whether the individual claiming unemployment benefits was discharged for conduct that fell below the standard of behavior expected by the employer. Next, the Court finds if the employer's expectation of behavior was objectively reasonable in the particular case. The employer's expectations must be communicated to the employee unless they flow naturally from the employment relationship.

*Id.* (internal citations omitted).

### 1. *Sadid's behavior fell below the standard expected by ISU.*

In the present case, Sadid's behavior clearly fell below the standard expected by ISU. ISU sent Sadid two letters informing him that his hostile accusations against the administrators of ISU to large groups of people were not acceptable. Sadid was informed that his concerns should not be mass-distributed to the faculty. Sadid was admonished on multiple occasions before the faculty and staff meeting to follow ISU's procedures for raising complaints, which require raising concerns first with his department chair, then his dean, then ISU's upper administration. It is undisputed that after several warnings, Sadid failed to conform his conduct to ISU's standards. He continued to air his concerns in mass emails and meetings. He also consistently copied ISU's upper administration on his emails. At the faculty meeting, Sadid went on numerous tirades, and continued to do so even after being informed that the faculty meeting was not the proper forum to raise such concerns. Sadid, therefore, failed to conform to the standards established and expected by ISU.

### 2. *ISU's standards were objectively reasonable.*

To be objectively reasonable, "[t]he employer's expectations must be communicated to the employee unless they flow naturally from the employment relationship." *Pimley v. Best Values, Inc.*, 132 Idaho 432, 436, 974 P.2d 78, 82 (1999). "[A]n employer has a right to expect that his employees will not engage in protracted argument after an order or directive is given." *Avery v. B & B Rental Toilets*, 97 Idaho 611, 614, 549 P.2d 270, 273 (1976). This does not require an employee to be absolutely docile. *Id.* "[A] single incident of comparatively nonserious disrespect by complaining and arguing is not misconduct." *Pimley*, 132 Idaho at 436, 974 P.2d at 82.

6

In *Avery*, the employee was discharged after he telephoned his employer to inform him of exceptionally dirty facilities that the employer serviced, and also complained about his route schedule. The employer discharged the employee. *Avery*, 97 Idaho at 613, 549 P.2d at 272. This Court found that this incident did not constitute misconduct, because there was no evidence of abusive or vulgar language and this was a singular instance of complaining. *Id.*

In *Gatherer v. Doyles Wholesale*, the employee was consistently informed that his disagreement with management, in public and before other employees, was inappropriate. The employer informed the employee that such concerns should be addressed in private. The employee failed to comply and was terminated. Those actions were found to constitute misconduct. *Gatherer*, 111 Idaho 470, 471–73, 725 P.2d 175, 176–78 (1986).

Here, ISU communicated its expectations to Sadid through his department chair and Dean Jacobsen. Sadid does not contend that these policies were not communicated to him. These expectations were again reinforced during the faculty meeting. Sadid was told that he "should not use such channels as campus-wide meetings, engineering faculty meetings, and widely-distributed email communications to make negative comments about the performance and/or character of . . . university staff and employees." Sadid does not allege that these expectations were inconsistent with ISU's employee policy manual, and does not indicate whether he actually received any policy manuals. Whatever significance ISU's employee policy manual has on this case was not raised or argued below. This Court will not address issues not raised before the Industrial Commission. *Combes v. State Indus. Special Indem. Fund*, 130 Idaho 430, 432, 942 P.2d 554, 556 (1997).

Unlike *Avery*, Sadid's conduct was not a single instance of complaint; rather, it was a pattern of potentially slanderous public accusations. It was continued abusive and disruptive conduct directed towards numerous persons—including his colleagues. Sadid had a habit of accusing these people of empire building, misconduct, and otherwise publically challenging their qualifications and experiences.

Like *Doyles*, Sadid was informed not to raise his concerns in public meetings—but he continued to do so. Sadid was informed not to discuss his evaluation in public—but he continued to do so. Sadid was encouraged to follow the proper channels for complaints—but he continued to raise concerns directly with ISU's upper administration. Sadid was asked to observe

7

collegiality[3]—but he challenged the experience and qualifications of his colleagues in public. Sadid was asked not to impeach the integrity or reputation of his colleagues—but he continued to do so. Sadid's continual failure to observe collegiality and follow proper conduct is both employment related misconduct and insubordination.

The Commission's finding that Sadid's actions constituted employment-related misconduct is supported by substantial and competent evidence. As a question of fact, this Court will not reweigh the evidence. Thus, the Commission did not err when it found that Sadid's actions constituted misconduct under I.C. § 72-1366.

**B.** **Whether Sadid's behavior was protected by the First Amendment bears on the objective reasonableness of ISU's requirements, but Sadid's conduct is not protected by the First Amendment.**

Sadid argues the Idaho Supreme Court should recognize an academic freedom exception to the public employee speech analysis established by the U.S. Supreme Court in *Garcetti v. Ceballos*, 547 U.S. 410 (2006). Sadid further argues that the Commission erred when it considered whether Sadid's actions were protected by academic freedom irrelevant to whether Sadid's actions amounted to employment-related misconduct.

*1.      Sadid is not judicially estopped from pursuing his argument.*

ISU argues that Sadid is judicially estopped from arguing that his speech in question was protected speech, because Sadid "took the position before the Appeals Examiner . . . that his discharge was simply a pretext for retaliation in reaction to his 'protected speech' made in articles over the past several years."

The doctrine of judicial estoppel was adopted by this Court in *Loomis v. Church*, 76 Idaho 87, 277 P.2d 561 (1954). Judicial estoppel precludes a party from advantageously taking one position, then subsequently seeking a second position that is incompatible with the first. *Id.* However, judicial estoppel does not preclude inconsistent positions taken before an administrative agency. The alleged inconsistent position taken by Sadid was taken before the Commission. Therefore, Sadid is not judicially estopped in this court from pursuing this argument. There might be other forms of estoppel available for administrative proceedings, but that estoppel, if any, should be raised in the agency.

*2.      Sadid's behavior does not implicate Academic Freedom.*

---

[3] Sadid has not challenged the standard of conduct required to establish "collegiality" or the lack thereof.

Sadid argues that his activity at the April 21, 2009, meeting does not constitute misconduct because it was protected by the doctrine of academic freedom, which should be recognized by this Court as an exception to the *Garcetti* framework. He further argues that since his speech was protected, ISU could have no reasonable expectation in curbing his academic freedom, nor would his failure to meet ISU's unreasonable expectation that he restrain his academic freedom constitute misconduct.

ISU counters that Sadid's constitutional arguments have "no relevance" on this appeal because the Commission did not err in deciding whether Sadid was terminated for misconduct. ISU argues that the Commission determines whether the employee's behavior fell below the standard expected by the employer, and whether that standard was objectively reasonable. By asking the Commission to rule on whether Sadid's speech was constitutionally protected, ISU argues that the Commission would exceed its authority by asking it to examine whether an employee was wrongfully discharged—which is a separate question from whether an employee's actions constitute misconduct for unemployment purposes. Finally, ISU argues that Sadid's speech was not protected by the First Amendment, because the doctrine of academic freedom inheres to the university as an institution, not individual professors, and protects in-class speech.

It is not necessary to decide whether there is an academic freedom exception to the *Garcetti* framework, because Sadid's conduct does not implicate academic freedom. Academic freedom is "the right to speak freely about political or ideological issues without fear of loss of position or other reprisal." Black's Law Dictionary, at 12 (9th ed. 2009). "[I]n line with such concepts as the 'marketplace of ideas' the First Amendment guarantees . . . recognize[ ] the importance to scholarly and academic communities of being free from ideological coercion." *Zykan v. Warsaw Cmty. Sch. Corp.*, 631 F.2d 1300, 1304 (7th Cir. 1980). The earliest application of academic freedom was the right for an educator "as teacher and investigator, to interpret his findings and to communicate his conclusions without being subjected to any interference, molestation, or penalization because the conclusions are unacceptable to some constituted authority . . . ." *Urofsky v. Gilmore*, 216 F.3d 401, 411 (4th Cir. 2000).

Academic freedom is irrelevant in this case, because Sadid's speech does not implicate this doctrine. Sadid was not speaking about political or ideological issues. The speech complained of involves potentially slanderous statements regarding the qualifications, experience, and performance of his colleagues as administrators—not even as scholars. His

speech made broad allegations of corruption and "empire building" based merely upon his disagreement with administrative decisions made by ISU. Sadid's speech, though quite contentious, cannot be said to be ideological. Sadid's statements do not relate to his position as an investigator or teacher of civil engineering. None of Sadid's tirades related to either his research findings or his interpretation of those findings. Rather, they related to whatever administrative obligations Sadid performed in his job. Though Sadid's unfiltered tirades were unacceptable to ISU, they were in no way related to his scholastic work as a civil engineering professor. The need to which the doctrine of academic freedom responds is the protection of a professor's research. At most, to whatever extent Sadid's comments extended beyond mere unprofessionalism and related at all to his position at ISU, it was as an administrator—not a scholar, not a researcher, not a teacher.

      *3.      Sadid's behavior is not protected under* Garcetti.

      Sadid alleges that ISU violated his First Amendment rights, because his speech was protected as academic freedom, not covered by the *Garcetti* framework. ISU contends that Sadid's speech was not protected as either academic freedom, or as protected speech as a public employee under *Garcetti*.

      The U.S. Supreme Court in *Garcetti* found that a state-employee must accept some limitations to his or her free speech rights. *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). However, a state-employee does not lose his or her First Amendment rights completely by nature of his or her public employment. *Id.* "A government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations." *Id.* The threshold issue is whether an employee's speech was made in the course of performing his or her official duties. *Id.* at 421–23. "[W]hen public employees make statements pursuant to their official duties . . . the Constitution does not insulate their communications from employer discipline." *Id.* at 421. However, if employees make "public statements outside the course of performing their official duties [they] retain some possibility of First Amendment protection." *Id.* at 423. In deciding this issue, the question is whether the subject matter of the speech owes its existence to the fact of employment, or is merely tangentially related to that fact. *See Pickering v. Bd. of Educ.*, 391 U.S. 563, 574 (1968) ("[because] the fact of employment is only tangentially and insubstantially

involved in the subject matter of the public communication made by a teacher, we conclude that it is necessary to regard the teacher as a member of the general public").

Sadid concedes that his speech at the April 21, 2009, faculty meeting, owed its existence *entirely* to the fact of his employment. During oral argument, Sadid conceded that his speech at the faculty meeting was pursuant to his official duties, and not as a private citizen. His statements were made by him, as a member of the university, to members of the university. The speech at the faculty meeting related to various personal issues regarding his official capacity at ISU including his personal evaluation, failure to be appointed department chair, and numerous criticisms of his superiors and colleagues. Sadid stressed that his speech was expected and solicited at the faculty meeting. Sadid contends that his speech was necessarily a part of his official duties as a professor. ISU does not dispute this point. Thus, Sadid admits his speech was not made as a private citizen but in his official capacity.

Sadid argues that his speech was constitutionally protected. But Sadid was not terminated for the content of what he said, but for his disruptive behavior. When determining whether an employee's speech is protected, courts consider the effect of the employee's conduct on the discipline and harmony among co-workers. *Lubcke v. Boise City*, 124 Idaho 450, 466, 850 P.2d 653, 669 (1993). An employer is not required to tolerate insubordination or insurrection. *Connick v. Myers*, 461 U.S. 138, 151 (1983). "When close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate." *Id.* It is not necessary "for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action." *Id.*

In *Connick*, an assistant district attorney was terminated after distributing questionnaires to her colleagues at the District Attorney's office after she was transferred to a new unit. The questionnaire asked for views on the office transfer policy, office morale, the need for a grievance committee, confidence in supervisors, and pressure for employees to work on political campaigns. *Id.* at 141. The U.S. Supreme Court found the political campaign question the sole issue of public concern. *Id.* at 149. The rest was a "mere extension[ ] of Myers' dispute over her transfer to another section . . . ." *Id.* at 148. Myers' dispute was a personal issue not entitled to First Amendment protection. *Id.* In *Connick*, the state-employer was justified in terminating the insubordinate assistant district attorney, because the state's interest as an employer enables it to prohibit insubordination. The U.S. Supreme Court noted that Myers "was trying to stir up other

people not to accept the changes that . . . were to be implemented." *Id.* at 152 n. 11. The evidence indicated that the assistant district attorney was leading a mini-insurrection, and was disrupting the routine of the office in her personal disagreement with superiors over the transfer policy. *Id.* at 151.

Here, Sadid was not terminated for the content of his speech. He was not terminated because of what he said, because of his dissatisfaction with ISU's upper administration, or even for expressing that dissatisfaction. He was terminated for insubordination and failing to conform his conduct to the standards required by ISU. Sadid was not asked to stop criticizing ISU's administration, he was merely asked to use proper channels in raising his concerns. Sadid was not asked to avoid discussing his personal evaluation with which he disagreed, he was simply asked not to raise those concerns in faculty meetings, and to escalate his concerns through proper channels. Sadid was asked to behave in a collegial manner with his colleagues, but his behavior destroyed professional relationships within the College of Engineering.

Sadid, like Myers, was absolutely engaged in insubordination. It was that insubordination and not the content of his speech that led to his termination. ISU instructed Sadid to raise his concerns with his department chair, the dean of the college, then upper administration. Sadid ignored ISU's policies and continued expressing his personal complaints in an inappropriate manner. It was an insurrection designed to undermine supervisors and colleagues with whom Sadid disagreed. Also, the record demonstrates that working together was a necessary component for a job in the College of Engineering. Throughout the meeting, Dean Jacobsen asked the faculty to work together. Faculty was encouraged to work together on interdisciplinary programs. And the sharing of limited school computers, space, and lab time between professors and their students was discussed. By the time Sadid was terminated by ISU, the disruption of the office was manifest, and working relationships were compromised. Not only was Dean Jacobsen constantly forced to deal with issues caused by Sadid, so too were faculty through Sadid's injection of personal matters into the faculty and staff meeting, and Sadid's mass distribution of emails regarding his personal matters.

ISU was disrupted by Sadid's insubordinate behavior. This disruption was evident at the faculty and staff meeting. The faculty and staff meeting lasted over two hours, largely because Sadid continually behaved in a manner inconsistent with the expectations communicated to him by ISU and Dean Jacobsen. At the faculty meeting, a staff member broke into tears expressing

how she hated "this conflict" and would leave if she financially could. Also, it was clear that Sadid was no longer able to work with his colleagues or superiors. Professor Imel asked Sadid "why can't we do anything right, Sadid?" Like the assistant district attorney in *Connick*, Sadid was insubordinate and disruptive to the routine of ISU.

It is important to note that the speech made at the April 21, 2009, meeting varies dramatically from the speech this Court decided was public in his earlier retaliation claim. The speech in that case involved statements made to the press. This Court found those statements were made as a private citizen, because it was not his job to make statements to the press. *Sadid v. Idaho State Univ.*, 151 Idaho 932, 939, 265 P.3d 1144, 1151(2011). But those statements are entirely separate from the employment-related tirades Sadid made to his supervisors, and colleagues, within the university, at a faculty meeting he was expected to attend, where he was expected to share his opinions on issues not related to his personal vendetta.

Therefore, Sadid's behavior was not protected by the First Amendment.

## VI. CONCLUSION

The Industrial Commission is affirmed in its finding that Sadid's conduct constituted employment-related misconduct. Furthermore, the Industrial Commission did not err in failing to consider Sadid's constitutional challenge because his conduct was not protected. Costs on appeal are awarded to ISU as the prevailing party.

Justices EISMANN, J. JONES and HORTON, and Justice *pro tem* SHINDURLING, CONCUR.