# IN THE SUPREME COURT OF THE STATE OF IDAHO
## Docket No. 46672

| | | |
|---|---|---|
| SIRANOUSH M. HIATT, | ) | |
| | ) | **Boise, January 2020 Term** |
| Claimant-Appellant, | ) | |
| | ) | **Opinion Filed: February 14, 2020** |
| | ) | |
| v. | ) | **Karen A. Lehrman, Clerk** |
| | ) | |
| HEALTH CARE IDAHO CREDIT | ) | |
| UNION, Employer; and IDAHO | ) | |
| DEPARTMENT OF LABOR, | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

Appeal from the Industrial Commission of the State of Idaho.

The Commission's decision is <u>affirmed</u>. Costs on appeal are <u>awarded</u> to Respondents.

McConnell Wagner Sykes & Stacey, PLLC, Boise, attorney for Appellant Siranoush M. Hiatt. Joseph M. Wager argued.

Lawrence G. Wasden, Idaho Attorney General, Boise, attorney for Respondent Idaho Department of Labor. Douglas A. Werth argued.

Kormanik & Sneed LLP, Boise, attorney for Respondent Health Care Idaho Credit Union. Bradley V. Sneed argued.

_____

BEVAN, Justice.

## I. NATURE OF THE CASE

Siranoush Hiatt appeals an Idaho Industrial Commission decision that affirmed the Idaho Department of Labor's denial of her request for unemployment benefits. The Commission determined that Hiatt was ineligible for benefits because she was terminated from Health Care Idaho Credit Union ("HCICU") for workplace-related misconduct. We affirm based on the substantial evidence in the record which supports the Commission's decision.

1

## II. FACTUAL AND PROCEDURAL BACKGROUND

Hiatt worked as a mortgage loan officer for HCICU from June 25, 2016 to February 22, 2018. At the time, HCICU had seven employees. As a result of its size and clientele, HCICU claims it is not like other financial institutions in the Boise area and operates on a limited budget. Even so, during Hiatt's first year with HCICU, her compensation was increased multiple times, including a commission increase in February 2017, in order to retain her services in the competitive mortgage lending industry. The CEO of HCICU, Fallon Eisenbarth, explained that HCICU had sought to restructure the mortgage department after the previous mortgage loan officer left because of unsatisfactory commissions. At Hiatt's request, HCICU also hired a loan processor sometime in 2016 to assist with Hiatt's workload. Because of these measures, Hiatt earned more than any other employee at HCICU, including the CEO.

On February 25, 2017, Hiatt suffered a mild traumatic brain injury when she fell at work and hit her head. At the direction of her neurologist, Hiatt began working reduced hours and receiving workers' compensation benefits. Hiatt testified that she became fearful that she would lose her job due to her reduced working hours and that she felt like someone wanted her to quit after the accident. However, other testimony showed HCICU and Eisenbarth were sympathetic to Hiatt's situation and accommodated her disability. For example, Eisenbarth testified "I had no problem with her disability whatsoever. I was very compassionate to her . . ." Arminda Kindrick, the operation supervisor for HCICU, testified "[a]fter [Hiatt's] injury every accommodation was made as far as, you know, when – when the doctor said that she needed to be off or a limitation on her hours. There was no hesitation in working around that schedule and making it work for her. There was no questioning it." Christy Ford, a teller for HCICU also testified that Eisenbarth worked with Hiatt on her schedule and that she did not believe Eisenbarth had an issue with Hiatt's disability.

Unfortunately, when HCICU later experienced budget shortfalls, Hiatt's pay was reduced two times; however, no one else at HCICU had their pay reduced. Even so, Hiatt continued to earn more money than any other employee at HCICU, including Eisenbarth. Hiatt's pay was reduced for the first time in August 2017, through hourly wage and commission rate reductions and capping her monthly commissions. This reduction in pay led to a confrontation between Eisenbarth and Hiatt – and on September 27, 2017, Eisenbarth gave Hiatt a verbal warning after Hiatt screamed at Eisenbarth during a conversation about the salary reduction. According to

Hiatt, after her first pay decrease, Eisenbarth began complaining about having to pay Hiatt vacation, 401k, sick leave, and other benefits that Hiatt would only be receiving if she were working full-time. Hiatt stated that Eisenbarth told her she would have to start using her sick leave and vacation pay to offset her workers' compensation time.

In February 2018, Hiatt was informed that her pay would be reduced a second time. This occurred after Eisenbarth met with the board of directors for a budget meeting, and the board decided to adjust Hiatt's income based on HCICU's diminished profitability. Eisenbarth testified that the previous year Hiatt made $156,000 and that her pay was being reduced to a flat salary of $72,000[1]. Hiatt believed that she was being targeted because of her disability. According to Eisenbarth, the reason behind Hiatt's pay decrease was that HCICU had lost money in 2017 for the first time since Eisenbarth took over as CEO in 2014.

On February 21, 2018 — about a week after Hiatt was told her pay would be reduced for the second time — Eisenbarth and Hiatt met again to discuss Hiatt's salary. Eisenbarth testified that during the meeting Hiatt became very hostile and started yelling. Eisenbarth stated she "couldn't get anywhere" with Hiatt so she asked Hiatt to work the rest of the day from home and return the next day with any questions that she had regarding her salary change. Hiatt claimed that she thought Eisenbarth was "just mad and kidding" when Eisenbarth shouted at her to leave and go home. However, later that day, Eisenbarth sent Hiatt the following email as a written warning for insubordination:

> This letter serves as formal written reprimand for your unprofessional conduct. I asked you to leave today because you engaged in insubordinate conduct by raising your voice. This behavior will not be tolerated.
>
> You cannot raise your voice in an unprofessional manner.
>
> It's best if you work from home the rest of the day and document your hours worked. I would like to discuss questions you may have tomorrow at 10:00. I would like you to write your questions down so we can stay on track.

Hiatt appeared the next day for the meeting with Eisenbarth and Kindrick. There is conflicting testimony about what occurred at that meeting. Hiatt testified that when they spoke about her pay decrease in the meeting she did get upset and cried but that she was "not yelling in any way, shape, or form." Hiatt reiterated her concern that she was being targeted for her

---

[1] HCICU contends that it actually offered Hiatt a salary of $79,000 in February 2018, but acknowledges that Eisenbarth testified that HCICU offered Hiatt a salary of $72,000.

disability, but admitted "[t]he conversation got a little bit heated" because Eisenbarth was getting frustrated that she was questioning why her pay was being cut when no one else's pay was being cut. Hiatt stated that toward the end of the conversation she said that she wanted to talk to the board of directors but Eisenbarth responded "no, we are cutting ties" and terminated Hiatt's employment.

Eisenbarth testified that during the meeting Hiatt did "the exact same thing she did the day before and just freaked out." Eisenbarth explained:

> She freaked out on me. She was yelling saying I'm a liar. I'm not fair. Why didn't I cut anybody else's salary and she – she just was screaming at me about miscellaneous things. You know, she was very upset that her salary was getting changed and, then, she said that she is going – she wants to talk to the board and she is going to get me fired. A lot of nonsense. Nothing professional. No – I mean it was so hostile and kind of out of control. I can't even repeat the entire conversation. But she was just very mad about her salary change and, then, you know, just screaming at me the entire time random things. I can't even repeat it, it was out of control.

Eisenbarth concluded stating that the reason Hiatt was terminated was because of her volatile behavior during the two February meetings and, since she had been warned about similar behavior the previous September, "it was kind of the final straw."

Kindrick stated that during the meeting Hiatt made accusations of impropriety towards Eisenbarth and her intentions and motivations for pay structure revisions. Kindrick described the meeting as "pretty difficult" and testified that "it was more accusations and -- and supposition." When asked about Hiatt's behavior Kindrick testified "[s]he was pretty combative. She was upset and accusatory. Didn't really want to listen to anything anybody had to say and, then, when it became more volatile – and at the end I believe – I'm not sure the exact statement but she said when the board heard exactly things that were going on that it would be [Eisenbarth's] job on the line."

Hiatt then applied for unemployment benefits. On the notice of claim and employer separation statement Eisenbarth stated that Hiatt was fired for insubordination. Eisenbarth explained Hiatt should have: "not raised [her] voice, shouldn't have threatened manager, been professional, no hostile behavior." The Idaho Department of Labor ("IDOL") determined that Hiatt was ineligible for unemployment insurance benefits because HCICU discharged Hiatt for employment-related misconduct. Hiatt appealed to the IDOL appeals bureau. After a telephonic

hearing the IDOL appeals examiner affirmed the denial of Hiatt's request for unemployment benefits.

Hiatt appealed and the Idaho Industrial Commission ("Commission") affirmed IDOL's decision. The Commission found that the evidence in the record established that Hiatt was upset and combative during both the February 21 and February 22 meetings. Hiatt made accusatory and threatening statements that the Commission found were likely delivered in a hostile rather than conversational tone. While the Commission recognized that Hiatt's annoyance over her compensation was understandable, it determined that frustration did not entitle her to exhibit unprofessional behavior towards her supervisor. The Commission found that after Hiatt's behavior on February 21, Eisenbarth warned Hiatt that her behavior was unacceptable and would not be tolerated; nonetheless, Hiatt did not heed the warning when she returned on February 22, and her behavior resulted in her discharge. The Commission was not persuaded by Hiatt's allegations that she was penalized for her injury, finding there was no substantive evidence in the record to support such claims. Hiatt timely appealed to this Court.

### III. ISSUE ON APPEAL

Whether the Commission's determination that Hiatt was discharged for employee misconduct is supported by substantial and competent evidence.

### IV. STANDARD OF REVIEW

In appeals from the Commission, this Court's review is limited to questions of law, "which include whether the Commission's factual findings are supported by substantial and competent evidence and the application of the facts to the law." *Harper v. Idaho Dep't of Labor*, 161 Idaho 114, 116, 384 P.3d 361, 363 (2016) (quoting *Poledna v. Idaho Dep't of Labor*, 158 Idaho 372, 374, 347 P.3d 1186, 1188 (2015). "Because the Commission is the fact finder, its conclusions on the credibility and weight of the evidence will not be disturbed on appeal unless they are clearly erroneous. This Court does not weigh the evidence or consider whether it would have reached a different conclusion from the evidence presented." *Ehrlich v. DelRay Maughan, M.D., P.L.L.C.*, 165 Idaho 80, 83, 438 P.3d 777, 780 (2019) (quoting *Christy v. Grasmick Produce*, 162 Idaho 199, 201, 395 P.3d 819, 821 (2017)). "The question of whether an employee's behavior constitutes misconduct in connection with employment pursuant to I.C. § 72-1366(e) is a question of fact, and we will uphold the Commission's determination of this

5

issue if supported by substantial and competent evidence." *Folks v. Moscow Sch. Dist. No. 281*, 129 Idaho 833, 836, 933 P.2d 642, 645 (1997) (internal citation omitted).

"Substantial evidence is more than a scintilla of proof, but less than a preponderance. It is relevant evidence that a reasonable mind might accept to support a conclusion." *Ehrlich*, 165 Idaho at 83, 438 P.3d at 780 (quoting *Christy*, 162 Idaho at 201–02, 395 P.3d at 821–22). "[T]his Court views all the facts and inferences in the light most favorable to the party who prevailed before the Industrial Commission." *Id.* (quoting *Bell v. Dep't of Labor*, 157 Idaho 744, 746–47, 339 P.3d 1148, 1150–51 (2014)).

## V. ANALYSIS

### The Commission's determination that Hiatt was discharged for employment-related misconduct is supported by substantial and competent evidence.

On appeal, Hiatt argues that the Commission's findings do not establish that her actions were willful or that she disregarded a standard of behavior expected by HCICU; thus, the Commission's findings do not support its conclusion that Hiatt was discharged for employment-related misconduct that would render her ineligible for unemployment benefits.

Claimants who have become unemployed through no fault of their own may be entitled to unemployment insurance benefits. In the case of a discharge, as was the cause for the separation here, the issue is whether the claimant committed some form of employment-related misconduct that would affect his or her ability to receive unemployment benefits under Idaho Code section 72-1366(5). "The focus of the inquiry is not whether the employer's reason for discharge was reasonable but, rather, whether the misconduct was work-related so as to make the employee ineligible for unemployment benefits." *Adams v. Aspen Water, Inc.*, 150 Idaho 408, 413, 247 P.3d 635, 640 (2011) (citing *Beaty v. City of Idaho Falls*, 110 Idaho 891, 892, 719 P.2d 1151, 1152 (1986)). Misconduct is defined in three alternative ways: (1) a willful, intentional disregard of the employer's interest; (2) a deliberate violation of the employer's reasonable rules; or (3) a disregard of a standard of behavior which the employer has a right to expect of its employees. IDAPA 09.01.30.275.02.

Here, the Commission found that Hiatt was discharged for employment-related misconduct after conducting a "standards of behavior" analysis. "Under the standard of behavior test, the employer must prove, by a preponderance of the evidence, that (1) the employee's conduct fell below the standard of behavior expected by the employer; and (2) the employer's

expectations were objectively reasonable under the circumstances." *Adams*, 150 Idaho at 413, 247 P.3d at 640. "In order for an employer's expectation to be objectively reasonable, the expectation must be communicated to the employee, unless the expectation is the type that flows naturally from the employment relationship." *Id*. "An expectation flows naturally from the employment relationship when the expectations are common among employees in general or within a particular enterprise." *Id*.

Generally, under the standards of behavior test, the employer need not prove that employee's conduct was willful, intentional, or deliberate. *Adams*, 150 Idaho at 413, 247 P.3d at 640. This is distinguishable from a finding of insubordination, which requires a "deliberate or wil[l]ful refusal . . . to obey a reasonable order or directive which an employer is authorized to give and entitled to have obeyed." *Locker v. How Soel, Inc.*, 151 Idaho 696, 700, 263 P.3d 750, 754 (2011) (internal citation omitted). Consistent with this Court's definition of insubordination, Hiatt focuses her first argument on a requirement that her actions must have been deliberate or willful. The flaw in this rationale is that the Commission did not base its decision on a finding that Hiatt was insubordinate. "Intentional insubordination is merely one [of the] way[s] by which an employer can prove misconduct as a disregard of the standards of behavior which the employer has a right to expect." *Folks*, 129 Idaho at 837, 933 P.2d at 646. The Commission based its decision on employee misconduct. As HCICU argues on appeal, while all insubordination must also be employee misconduct, not all employee misconduct reaches the level of deliberate, willful insubordination. Thus, while Eisenbarth accused Hiatt of insubordination, the Commission's analysis was not limited to determining whether Hiatt committed insubordination; instead, the Commission focused on the conduct which falls under the larger umbrella of "employee misconduct." As such, it was unnecessary for the Commission to find that Hiatt acted "willfully or deliberately."

Thus, we review the Commission's decision as it stands. We must determine whether the record contains substantial and competent evidence to support the Commission's finding that Hiatt disregarded a standard of behavior which HCICU had a right to expect, and that HCICU's expectation was objectively reasonable. "In order for an employer's expectation to be objectively reasonable, the expectation must be communicated to the employee, unless the expectation is the type that flows naturally from the employment relationship." *Adams*, 150 Idaho at 413, 247 P.3d at 640.

Hiatt argues that at the February 21 meeting Eisenbarth advised her that raising her voice in an unprofessional manner was insubordinate behavior that would not be tolerated. Even so, she argues that because the Commission did not make a specific finding that Hiatt had raised her voice at the February 22 meeting, Hiatt did not breach a standard of behavior that was communicated to her. We disagree. Hiatt was warned two times that her behavior was unprofessional and would not be tolerated. On September 27, 2017, Hiatt received a verbal warning that "screaming" at Eisenbarth was not acceptable. On February 21 Hiatt received a written reprimand for her unprofessional conduct and was asked to leave work. Despite these warnings concerning her conduct, Hiatt returned to work on February 22 and engaged in the same unprofessional behavior, which ultimately led to her discharge.

"[A]n employer has a right to expect that [its] employees will not engage in protracted argument after an order or directive is given." *Sadid v. Idaho State Univ*., 154 Idaho 88, 95, 294 P.3d 1100, 1107 (2013) (quoting *Avery v. B & B Rental Toilets*, 97 Idaho 611, 614, 549 P.2d 270, 273 (1976)). We recognize that this does not require an employee to be absolutely docile. *Id*. Indeed, "a single incident of comparatively nonserious disrespect by complaining and arguing is not misconduct." *Id*. (quoting *Pimley v. Best Values, Inc*., 132 Idaho 432, 436, 974 P.2d 78, 82 (1999)); *see also Avery,* 97 Idaho at 615, 549 P.2d at 274 (citing 76 Am. Jur. 2d, Unemployment Compensation, §§ 52, 55 (1975)).

However, the testimony in the record reveals that Hiatt's conduct went well beyond "a single incident of comparatively nonserious disrespect" at the time she was terminated. As mentioned above, Hiatt had received two warnings about her behavior prior to the February 22 meeting. Still, Eisenbarth testified that during the February 22 meeting Hiatt "freaked out," was "hostile," and "out of control." Consistent with this testimony, Kindrick described Hiatt's behavior during the meeting as "pretty combative," "accusatory," and "volatile." And Kindrick testified that Eisenbarth made the decision to terminate Hiatt's employment after Hiatt threatened Eisenbarth. Even Hiatt acknowledged that "[t]he conversation got a little bit heated." The Commission determined that Hiatt was on notice that her unprofessional behavior would not be tolerated at HCICU; yet, Hiatt returned to work on February 22 and engaged in the same type of behavior. While the Commission failed to make a specific finding that Hiatt raised her voice, it described her conduct as "combative," "accusatory," and "threating," concluding that Hiatt's statements were likely delivered in a hostile, rather than conversational tone.

Even if the Commission had found that HCICU failed to warn Hiatt that her unprofessional behavior would not be tolerated, we have recognized that some expectations and standards of behavior need not be communicated to the employee because they "flow normally from an employment relationship." *Folks*, 129 Idaho at 838, 933 P.2d at 647. Hiatt should have reasonably understood that she was not permitted to speak to the CEO of HCICU in a combative, volatile, accusatory, or threatening tone. Nevertheless, Hiatt claims that the February 22 meeting was not a common occurrence and the only instruction given to her before the "tense and novel" meeting was that she not raise her voice. That an employee must appear for a stressful meeting does not give the employee the right to "fly off the handle" in an unprofessional manner. Ultimately, the Commission found that Hiatt was volatile and combative during both the February 21 and February 22 meetings, and this unprofessional behavior was the misconduct that ultimately led to Hiatt's termination. We hold that the Commission's finding that Hiatt was discharged for employment-related misconduct is supported by substantial and competent evidence in the record.

Hiatt concludes with two public policy arguments. First, Hiatt asserts that reporting discrimination cannot be workplace related misconduct. Hiatt claims her reporting of discrimination was a protected activity under the Idaho Commission on Human Rights, Idaho Code section 67-5901-5911 ("ICHR"). Under the ICHR it is unlawful to discriminate on the basis of disability, and it is unlawful to discriminate against a person who opposes that discrimination. I.C. § 67-5909; I.C. § 67-5911. Hiatt concedes "[t]he record is far too sparse to litigate the issue of retaliation or discrimination under the ICHR,[2]" but maintains there is sufficient evidence to demonstrate Hiatt was engaging in a protected activity—reporting workplace discrimination. That said, the Commission specifically found that while Hiatt was entitled to her own beliefs and opinions about the facts here, there was no substantive evidence in the record to support Hiatt's allegations that she was penalized for her injury. "[C]onclusions on the credibility and weight of the evidence will not be disturbed on appeal unless they are clearly erroneous. This Court does not weigh the evidence or consider whether it would have reached a different conclusion from the evidence presented." *Ehrlich*, 165 Idaho at 83, 438 P.3d at 780. Contrasting Hiatt's supposition was the direct testimony of Eisenbarth and Kindrick who

---

[2] Hiatt has apparently filed a separate state court action which will decide her allegations of discrimination and/or retaliation in violation of the ICHR.

both stated Hiatt was terminated for her conduct on February 22, not her disability. The Commission properly weighed this evidence and determined that Hiatt was terminated for employment-related misconduct. As a result, this policy claim has no support in the record.

Hiatt's second policy argument is that she could have voluntarily quit based on her drastic pay cut and received unemployment benefits. Indeed, this Court has recognized that receiving a 50% pay reduction constitutes good cause for voluntarily quitting. *Kyle v. Beco Corp.*, 109 Idaho 267, 269–70, 707 P.2d 378, 380–81 (1985). Hiatt argues that had she voluntarily quit and refused to work on February 22, she would have been eligible for unemployment benefits. While this might be true, Hiatt did not elect to voluntarily quit after she learned of her pay cut; instead, Hiatt returned to work on February 22 and chose to exhibit the same combative and hostile behaviors she had been warned about twice before. Thus, we decline to address this policy argument because it is speculative and unsupported by the record.

## VI. CONCLUSION

The Commission's decision is affirmed. Costs on appeal are awarded to Respondents.

Chief Justice BURDICK, Justices BRODY, STEGNER and MOELLER, CONCUR.