IN THE SUPREME COURT OF THE STATE OF IDAHO
Docket No. 36501

|  |  |  |
|---|---|---|
| MATTHEW S. ADAMS, | ) | Boise, January 2011 Term |
| Claimant-Appellant, | ) | |
| v. | ) | 2011 Opinion No. 15 |
| ASPEN WATER, INC., Employer, IDAHO DEPARTMENT OF LABOR, | ) | Filed: February 3, 2011 |
| Respondents. | ) | Stephen W. Kenyon, Clerk |

Appeal from the Industrial Commission of the State of Idaho.

The decision of the Industrial Commission is affirmed.

Matthew S. Adams, Garden City, appellant pro se.

Honorable Lawrence G. Wasden, Attorney General, Boise, for respondent. Tracy Rolfsen argued.

_____

J. JONES, Justice.

Matthew Adams appeals the Industrial Commission's determination that he is not eligible for unemployment benefits because he was terminated for employment-related misconduct. We affirm.

**I.**
**Factual and Procedural Background**

Matthew Adams was employed by Aspen Water, Inc., a firm that sells and services water softening systems, from September of 2007 until his termination on November 4, 2008. Adams worked as an installer and generally spent his time conducting installations, making service calls, or completing paperwork around the office. In October of 2008, Adams sustained a workplace injury and was placed on light duty.

The events that led to Adams' termination occurred on November 3, 2008. On that morning, Adams completed a service call around 9:30 a.m. After completing the service call, he

1

took an early lunch break. After his lunch break, Adams went to the Department of Motor Vehicles (DMV) to renew his driver's license. After realizing the line to renew his license was too long, he returned to work around 12:35 p.m. Around 2:00 p.m., Adams turned in his log sheet, left work in his personal vehicle, and again returned to the DMV to attempt to renew his driver's license. Adams did not seek permission from anyone at Aspen prior to visiting the DMV on either occasion.

Around 3:00 p.m., while Adams was at the DMV the second time, Terry Sidwell, the owner of Aspen, called Adams on his company cell phone, and Adams informed Sidwell that he was at the DMV. Adams did not return to work after visiting the DMV for the second time. Adams was terminated the following day for leaving work without permission and failing to notify anyone at Aspen that he would not be returning to work. Aspen did not fill Adams' position as an installer following his termination.

Adams subsequently submitted a claim for unemployment benefits, and the Idaho Department of Labor (IDL) initially found that he was not eligible for benefits because he was terminated for employment-related misconduct.[1] Adams then appealed the decision regarding his eligibility status, and a telephonic hearing was held on the matter before the IDL Appeals Examiner. At the hearing, Adams argued that his termination was not a result of any misconduct on his part but, rather, was a result of Aspen's desire to terminate him for financial reasons. According to Adams, prior to his termination, Aspen had been experiencing financial problems, including gas credit cards being shut off and accounts at their plumbing supply store being frozen. Adams argued that Aspen was motivated to terminate him due to its financial distress, which is why his position was not filled after he was terminated. Adams also contended that Aspen was upset with him for filing a workers' compensation claim to cover the work-related injury that he had incurred two weeks prior to his termination, which was another possible motive for his termination.[2]

---

[1] The record indicates that Aspen initially took the position that Adams had voluntarily quit his employment with Aspen. This is troubling given that Adams had only missed one afternoon of work, while the policy in Aspen's employee handbook states that "[t]wo consecutive days of absence is considered voluntary termination." However, the Appeals Examiner found that Adams was terminated by Aspen, and the arguments on appeal to this Court focus on whether Adams' termination was a result of employment-related misconduct.

[2] Adams testified that Sidwell had tried to convince him to cover his work-related injury through personal insurance rather than submitting a claim for workers' compensation.

Additionally, while Adams conceded he did not notify Aspen prior to visiting the DMV on either occasion, he testified that it was common for installers at Aspen, including himself, to run personal errands on company time as long as it did not interfere with service calls or other job-related responsibilities. Adams acknowledged the existence of a provision in Aspen's employee handbook that required employees to obtain permission prior to attending to personal business during work hours, but asserted that Aspen never followed this policy and continuously allowed employees to run personal errands during work hours without first notifying Aspen. While Adams did admit at the hearing that he had never previously taken three hours off work in one day without notifying Aspen, he testified that he did not contemplate that the DMV would be so busy that it would take several hours for him to renew his license.

Finally, Adams argued that because Aspen's employee handbook provides for a progressive disciplinary procedure, which includes a verbal or written warning prior to termination, it was unreasonable for Aspen to terminate him without first warning him that he could be terminated for not notifying Aspen before running a personal errand at work. Adams continually asserted that he had never been reprimanded for any of his behavior at work and was a valuable and appreciated employee at Aspen.

On the other hand, Aspen argued that even though it generally tried to work with employees who needed to run personal errands during work, employees were consistently required to adhere to the break policy laid out in the handbook by notifying a supervisor prior to leaving work for personal reasons. Aspen agreed that Adams had previously been allowed to take care of personal business during work hours if it did not interfere with his work responsibilities, but argued that Adams cost the company money when he left work for the entire afternoon without notifying anyone. Finally, Aspen argued that it was not required to warn Adams prior to terminating him because, while the handbook denotes a progressive disciplinary scheme, the handbook also makes clear that it is within the employer's discretion to determine the appropriate corrective action, which includes termination. While Aspen conceded that Adams' actions on November 3 were a one-time incident, it argued that the seriousness of his actions warranted termination.

The Appeals Examiner ultimately concluded that Adams was discharged for reasons unrelated to employee misconduct and, thus, was eligible for unemployment benefits. More specifically, the Appeals Examiner concluded that because it was an accepted practice for installers to run personal errands without notifying Aspen, it was "inappropriate to label the events of

3

[Adams'] final day as any kind of egregious policy violation that justified overriding the progressive disciplinary procedures in favor of immediate termination." The Appeals Examiner also found that because Adams had recently suffered a work-related injury and Aspen had decided not to hire another installer to fill Adams' position, Aspen could have been motivated to terminate Adams for reasons other than misconduct.

Thereafter, Aspen appealed the decision to the Industrial Commission. After conducting a *de novo* review of the record, the Commission concluded that Adams was not eligible for unemployment benefits because his termination was a result of employment-related misconduct. According to the Commission, the fact that Aspen was experiencing financial difficulties and was unhappy that Adams had applied for workers' compensation did not excuse Adams from leaving work in the middle of the day without permission. The Commission found that even though it was common for installers at Aspen to take time off work to run short personal errands, such as trips to the bank, without first notifying Aspen, Adams did more than simply run a short errand when he took three hours off in a single day to conduct personal business. The Commission further found that although the record did not establish that Aspen communicated to Adams its expectation that he obtain permission prior to taking an extended absence, "an employer has a reasonable expectation that an employee will show up for work and stay at work, and [] such an expectation flows naturally from the employment relationship." Adams timely appealed the Commission's decision to this Court.

## II.
### Issue on Appeal

I.   Whether the Commission's factual finding that Adams was terminated for employment-related misconduct is supported by substantial and competent evidence.

## III.
### Discussion

#### A.   Standard of Review

When reviewing a decision from the Industrial Commission, this Court exercises free review over questions of law. IDAHO CONST. art. V, § 9; *Harris v. Electrical Wholesale*, 141 Idaho 1, 3, 105 P.3d 267, 269 (2004). The Commission's findings of fact will only be disturbed if not supported by substantial and competent evidence. *Henderson v. Eclipse Traffic Control & Flagging, Inc.*, 147 Idaho 628, 631, 213 P.3d 718, 721 (2009). Substantial and competent

evidence is "relevant evidence that a reasonable mind might accept to support a conclusion." *Id.* The Commission's findings will not be disturbed solely because there is conflicting evidence in the record, or because the Court may have reached a different conclusion. *Harris*, 141 Idaho at 3, 105 P.3d at 269. "[I]t is up to the Commission to weigh the conflicting evidence and determine the credit and the weight to be given the testimony admitted." *Henderson*, 147 Idaho at 631, 213 P.3d at 721. Furthermore, all facts and inferences are viewed in favor of the prevailing party before the Commission. *Higgins v. Larry Miller Subaru-Mitsubishi*, 145 Idaho 1, 4, 175 P.3d 163, 166 (2007).

### B.     Employment-Related Misconduct

An individual is only entitled to unemployment benefits where "[t]he claimant's unemployment is not due to the fact . . . that he was discharged for misconduct in connection with his employment." I.C. § 72-1366(5). Employment-related misconduct includes any of the following: "(1) a willful, intentional disregard of the employer's interest; (2) a deliberate violation of the employer's reasonable rules; or (3) a disregard of a standard of behavior which the employer has a right to expect of his employees." *Kivalu v. Life Care Centers of America*, 142 Idaho 262, 264, 127 P.3d 165, 167 (2005); IDAPA 09.01.30.275.02. "The burden of proving misconduct by a preponderance of the evidence falls strictly on the employer, and where the burden is not met, benefits must be awarded to the claimant." *Harris*, 141 Idaho at 3, 105 P.3d at 269; IDAPA 09.01.30.275.01.

The Commission must consider all three grounds when determining whether an employee's termination was a result of employment-related misconduct. *Smith v. Zero Defects, Inc.*, 132 Idaho 881, 884, 980 P.2d 545, 548 (1999). The focus of the inquiry is not whether the employer's reason for discharge was reasonable but, rather, whether the misconduct was work-related so as to make the employee ineligible for unemployment benefits. *Beaty v. City of Idaho Falls*, 110 Idaho 891, 892, 719 P.2d 1151, 1152 (1986). Whether an employee's behavior constitutes misconduct is a factual determination that will be upheld if supported by substantial and competent evidence. *Harris*, 141 Idaho at 3, 105 P.3d at 269.

In this case, the Commission considered all three grounds for misconduct, but determined that the issue could be disposed of under the standard of behavior test and, thus, based its decision solely on the ground that Adams' failure to report to work as expected on the afternoon

5

of November 3, without contacting his employer, fell below the reasonable standard of behavior an employer is entitled to expect.

Under the standard of behavior test, the employer must prove, by a preponderance of the evidence, that (1) the employee's conduct fell below the standard of behavior expected by the employer; and (2) the employer's expectations were objectively reasonable under the circumstances. *Harris*, 141 Idaho at 4, 105 P.3d at 270; IDAPA 09.01.30.275.02(c). Generally, an employer's burden of proof under the standard of behavior test does not require a showing that the employee's conduct was willful, intentional, or deliberate. *Harris*, 141 Idaho at 4, 105 P.3d at 270. The first prong of the test addresses only what the employer subjectively expected from the employee, while the second prong considers whether the employer's expectations are reasonable. The record establishes that Aspen subjectively expected Adams to provide notification prior to taking three hours off to run a personal errand. Therefore, the only issue for this Court to determine is whether the Commission's conclusion that Aspen's expectation was objectively reasonable under the circumstances is supported by substantial and competent evidence.

In order for an employer's expectation to be objectively reasonable, the expectation must be communicated to the employee, unless the expectation is the type that flows naturally from the employment relationship. *Id.* An expectation flows naturally from the employment relationship when the expectations are common among employees in general or within a particular enterprise. *Appeals Examiner of Idaho Dep't of Labor v. J.R. Simplot Co.*, 131 Idaho 318, 322, 955 P.2d 1097, 1101 (1998). Such expectations are generally limited to fundamental expectations and do not involve specific rules unless clearly embodied in the job at issue. *See, e.g., Pimley v. Best Values, Inc.*, 132 Idaho 432, 435, 974 P.2d 78, 81 (1999) (holding that a retail employer has a reasonable expectation flowing naturally from the employment relationship that its employees will not make vulgar comments about coworkers and supervisors in the presence of customers and other coworkers); *Bullard v. Sun Valley Aviation, Inc.*, 128 Idaho 430, 434, 914 P.2d 564, 568 (1996) (finding that an employer's expectation that an employee will comply with federal rules and the employer's manual, which both required permission prior to crossing a runway, flowed naturally from a line service position at an airport). In other words, the relevant question is whether the employee has breached "a standard of behavior that would flow normally from an employment relationship or which was communicated to [the employee]

6

because of its uncommon nature." *Wulff v. Sun Valley Co.*, 127 Idaho 71, 75, 896 P.2d 979, 983 (1995).

In this case, the Commission found that, while the record did not establish Aspen had ever communicated to Adams its expectation that he seek permission before taking an extended absence, an employer has a reasonable expectation an employee will "show up for work and stay at work," and such an expectation flows naturally from the employment relationship. The Commission, in its written Decision and Order, stated:

> It may be true that the Employer was in financial distress and that the business was able to continue functioning with two installers rather than three[3] after discharging Claimant. It also may be that Mr. Sidwell was not pleased that Claimant filed a worker's compensation claim. However, these conditions do not excuse Claimant from leaving work in the middle of the day without permission or other communication. Employers have a reasonable expectation that their employees will work the hours that they are scheduled. That expectation in this case did not "vanish" because Employer may have been having financial problems.
> Claimant's failure to report for work as expected without contacting his supervisor, regardless of the reason for his absence, fell below the reasonable standard Employer was entitled to expect. That behavior resulted in Claimant's discharge. Therefore, we conclude that Employer discharged Claimant for employment-related misconduct.

The Commission correctly concluded that the expectation employees will work the hours they are scheduled to work is the type of expectation that flows naturally from the employment relationship. Expecting an employee to come to work, and stay at work, during scheduled hours is a fundamental expectation shared by employers in every field of work. However, an employer's expectation, even if it flows naturally from the employment relationship, is not objectively reasonable if it is contrary to an established course of conduct. *Davis v. Howard O. Miller Co.*, 107 Idaho 1092, 1095, 695 P.2d 1231, 1234 (1984). For example, in *Davis*, a gas station manager was terminated, in part, for temporarily leaving work without notifying his employer. *Id.* at 1094, 695 P.2d at 1233. Prior to his termination, the manager had occasionally left work for one to two hours per week after first arranging for another employee to take his place. *Id.* at 1093, 695 P.2d at 1232. It was common for managers, including those who worked at other local gas stations owned by the employer, to leave during their scheduled shifts without

---

[3] As Adams correctly points out in briefing, the Commission mistakenly asserts that Aspen went from three installers to two installers after Adams was terminated. The record is clear that Aspen actually went from two installers to one installer after Adams was terminated.

7

notifying the employer. *Id*. This type of temporary absence was generally tolerated as long as the manager arranged for another employee to cover the absence. *Id*. This Court found that the manager's act of temporarily leaving work without notification did not fall below a reasonable expectation of employee behavior because the employer had tolerated such absences for several months, had failed to express to the employee any disapproval with regard to such conduct, and had not informed the employee that his conduct was not acceptable. *Id.* at 1095, 695 P.2d at 1234.

This Court conducted a similar analysis in *Folks v. Moscow School District No. 281*, 129 Idaho 833, 838, 933 P.2d 642, 647 (1997). In *Folks,* a teacher was terminated for an outburst of profanity directed at the school principal. *Id.* at 835, 933 P.2d at 644. Over the course of two or three years prior to the incident, the teacher and the principal had engaged in a pattern of communication that often included the use of profanity by the teacher. *Id.* at 835, 839, 933 P.2d at 644, 648. Additionally, the principal and the teacher had previously been teaching colleagues at the same school and had developed an informal relationship in which they both engaged in the use of profanity. *Id.* at 835, 933 P.2d at 644. This Court upheld the Commission's finding that an expectation contrary to the established course of conduct was not objectively reasonable and, therefore, the teacher's termination was not a result of employment-related misconduct. *Id.* at 838, 933 P.2d at 647. The Court emphasized that through his acquiescence, the principal had led the teacher to believe that her conduct was acceptable and was not inappropriate or unprofessional. *Id*.

In this case, the Commission found that Aspen "expected installers to get permission before taking extended absences during the day, but not necessarily for short errands, such as trips to the bank." While there is conflicting evidence in the record regarding whether installers were required to give notice even for short errands, the Commission made a specific finding that such errands were allowed without notice to Aspen. This finding is supported by Adams' testimony that installers at Aspen, including himself, were consistently allowed to run short errands without notifying Aspen, and that such a practice had never been a problem in the past. Thus, it appears that, like in *Folks* and *Davis*, Aspen led its installers to believe that running short personal errands at work was an acceptable practice despite the break policy in the employee handbook stating otherwise. However, the crux of the Commission's decision was that Adams' personal errand on November 3 was much different than the short personal errands previously

8

allowed by Aspen. To support its position, the Commission pointed out that Adams conceded that he had never taken off three hours in one day without notifying Aspen. The Commission also pointed out that Adams did more than just take the afternoon off for personal business, because from 10:15 a.m. to 12:25 p.m., Adams was on his lunch break and visiting the DMV for the first time during work hours.

There is substantial and competent evidence in the record to support the Commission's conclusion that Adams' absence on November 3 was an extended absence that required prior notification, rather than a short errand that required no notice. Most importantly, the Commission's finding is fully supported by Adams' own testimony before the Appeals Examiner, where he conceded that he had never previously taken three hours off in one day and that such a practice was unprecedented rather than common practice. Although Adams intended for his trip to the DMV to be the type of short personal errand that Aspen permitted without notice, it ultimately turned into an errand that took the greater part of an afternoon. Adams testified that he left the DMV the first time because the line to renew his license was too long, which indicates he thought it was inappropriate, at that time, to wait in such a long line instead of returning to work. Once Adams realized, during his second visit, that the line at the DMV had not diminished, he could have opted to once again return to work, especially given his knowledge that he had not previously been allowed to take several hours off in one day without notifying Aspen. Furthermore, as the Commission pointed out, Adams spent very few hours working on November 3 as a result of his two trips to the DMV and his early lunch break, which does not seem to be in accord with the course of conduct that Aspen had previously allowed. Therefore, this case is categorically different than *Folks* and *Davis* because the conduct for which Adams was terminated was not the type of conduct previously authorized by the employer.

Adams correctly asserts in briefing that the Commission failed to address the telephone conversation that occurred between Sidwell and Adams at around 3:00 p.m. while Adams was at the DMV, wherein Sidwell was informed of Adams' whereabouts. Although it is true that Aspen eventually learned Adams was at the DMV, Sidwell testified that Aspen lost money that afternoon because Adams was unable to complete any customer-service jobs as a result of his trip to the DMV. Additionally, in a letter to the Commission, admitted as an exhibit at the hearing, Melissa Miller, the general manager of Aspen, explained that she wanted to send Adams on a job that afternoon, but she did not know where Adams was or when he had left work. If

9

Aspen had been notified in advance that Adams intended to take the entire afternoon off, perhaps it could have made other arrangements for any service call that needed to be made. However, the evidence indicates that because of Adams' failure to notify Aspen, his extended trip to the DMV interfered with his work-related responsibilities that afternoon, which is also not in accord with the course of conduct previously allowed by Aspen. Thus, there is substantial and competent evidence to support the Commission's conclusion that Adams' conduct fell below a reasonable standard of behavior that Aspen was entitled to expect.

Adams also argues that regardless of whether Aspen's expectations were objectively reasonable, he was terminated as a result of Aspen's financial problems, and not his own misconduct. Adams relies on this Court's decision in *Davis* to support his argument. In *Davis*, the employer asserted that one of the reasons the employee was terminated was because he did not honestly fill out his employment application by failing to list a prior job that had lasted only three to four days. 107 Idaho at 1096, 695 P.2d at 1235. However, the Commission found that the employee was not terminated because of his dishonesty on the application but, rather, because the employer had learned that the employee had interviewed for another job and feared the employee would quit his job without notice. *Id*. at 1094, 695 P.2d at 1233. According to the Commission, the employer had discovered that the employee had quit a previous job, the one he had failed to mention on his application, without providing notice, and the employer feared he would do the same thing if he obtained a different job. *Id*. This Court agreed with the Commission's conclusion, pointing out that the employer had specifically testified that the employee

> just quit [his previous job] like that. And so when he started being absent a lot and then when I called him that day to see where he was the previous day and he said he had a job interview. *That did it as far as we were concerned, we could not take a chance on having him quit us without notice.*

*Id*. at 1096, 695 P.2d at 1235 (emphasis in original). For these reasons, the Court found substantial and competent evidence in the record to support the Commission's finding that the employee was not terminated for misconduct. *Id*.

While the holding in *Davis* does establish that an employee should not be denied unemployment benefits when he or she is terminated for reasons other than misconduct, the facts in *Davis* are distinguishable from the facts in this case in two important ways. First, in *Davis*, there was an explicit statement by the employer that indicated he was motivated to terminate the

10

employee for reasons other than the employee's alleged misconduct. In this case, Aspen specifically denied any allegation that Adams was terminated for any reason other than the fact that he had left work for a prolonged personal errand without first notifying Aspen. Second, the Commission in *Davis* specifically made a finding of fact that the employer terminated the employee for reasons other than misconduct. In this case, the Commission found Adams was terminated for misconduct. Although it is true that Aspen did not fill Adams' position as an installer after he was terminated, which tends to support Adams' argument that he was terminated for financial reasons, without a finding by the Commission that Aspen actually had alternative motives for the termination, this Court cannot make such a finding. Because there is substantial and competent evidence in the record to support the Commission's finding of misconduct, Adams' argument that Aspen had alternative motives for terminating him fails.

Lastly, Adams argues that it was unreasonable for Aspen to terminate him without a prior warning, given the progressive disciplinary procedure denoted in the employee handbook. However, this Court has previously found that the issue of whether an employer should have chosen a different form of discipline from its hierarchy of disciplinary measures is wholly irrelevant when considering whether an employee's actions constitute employment-related misconduct. *Alder v. Mountain States Telephone & Telegraph Co.*, 92 Idaho 506, 512, 446 P.2d 628, 634 (1968). In *Alder*, this Court rejected the employees' argument that the employer had a duty to warn them that their behavior could result in termination, and specifically noted that:

> [such an argument] is irrelevant to the only issue decided by the Industrial Accident Board below and by this decision, namely, whether appellants were discharged for misconduct. Substantively, however, the argument is faulty because it is wholly within the employer's discretion to mete out various forms of discipline for misconduct. This Court has no legal basis upon which it could interfere with the internal disciplinary matters of an employer once employee misconduct has been found.

*Id.*[4] Consequently, Adams' argument is not relevant to the issue of whether his actions on November 3 amounted to employment-related misconduct.

---

[4] It should be noted that the employees in *Alder* were making a general argument, based on fairness and equity, that the employer had a duty to warn them that their conduct could lead to termination. This is distinguishable from the case at hand because Aspen has a specific progressive disciplinary policy. However, the issue of what disciplinary measures should have been taken, assuming employee misconduct, is an issue separate and distinct from the issue of whether an employee's actions constitute misconduct.

11

## IV.
## Conclusion

While this is not a clear-cut case, and Adams has advanced several persuasive arguments in support of his position, this Court does not reweigh evidence or consider whether it would have reached a different conclusion on the matter. There is substantial and competent evidence to support the Commission's determination that Adams was terminated for employment-related misconduct. Therefore, we affirm the Commission's decision to deny Adams unemployment benefits.

Chief Justice EISMANN, and Justices W. JONES and HORTON CONCUR.

Justice BURDICK dissenting without opinion.