# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 50457

THOMAS E. HENNIG, JR.,                )
                                      )
   Claimant-Appellant,               )
                                      )    **Boise, May 2024 Term**
v.                                    )
                                      )    **Opinion Filed: July 3, 2024**
MONEY METALS EXCHANGE, L.L.C., )
Employer; IDAHO DEPARTMENT OF )    **Melanie Gagnepain, Clerk**
LABOR,                                )
                                      )
   Defendants-Respondents.            )
_____ )

Appeal from the Idaho Industrial Commission.

The decision of the Industrial Commission is <u>reversed</u>, and the case is <u>remanded</u>.

Thomas E. Hennig, Jr., Meridian, Appellant Pro Se. Thomas E. Hennig, Jr., argued.

Raúl R. Labrador, Idaho Attorney General, Boise, for Respondent. Rafael Icaza argued.

_____

BRODY, Justice.

This appeal arose from an Idaho Industrial Commission ("the Commission") decision that denied Thomas E. Hennig, Jr.'s ("Hennig"), application for unemployment insurance benefits. Hennig was discharged by his employer, Money Metals Exchange, L.L.C. ("Money Metals"), after he referred to himself as his employer's "good little Nazi" on the company's instant message system—a comment which Hennig alleges was a joke about being strict in enforcing the company's time clock rules. Following his termination, Hennig applied for unemployment benefits. An Appeals Examiner with the Idaho Department of Labor ("IDOL") entered a determination finding Hennig ineligible for benefits because he was discharged for misconduct connected with his employment. Hennig appealed to the Commission, which affirmed the Appeal Examiner's decision. Hennig timely appealed to this Court, arguing that the Commission's decision was unsupported by competent and substantial evidence. For the reasons set forth below, we reverse the Commission's decision and remand for further proceedings.

1

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Background

Hennig worked as a weekend shift supervisor for Money Metals Exchange, L.L.C. His job duties included monitoring and correcting time clock punches of his coworkers. About three months into his employment, Hennig explained to a new employee how he handled variances in time away from work during a shift by referencing a situation involving another employee who took longer lunches to take care of her pet. When she learned Hennig had referenced her by name in the conversation, the other employee took offense to Hennig's disclosure and complained to management.

Three days later, on August 12, 2022, Daniel Novak, Money Metals' vault and fulfillment manager, met with Hennig to discuss this matter. Novak testified that he "re-briefed" Hennig on Money Metals' "communication policy and how to professionally conduct [himself] in the workplace, which is to keep in mind a professional workplace, communicating with . . . professionalism with employees and the people around them." This policy states, in relevant part:

> All in person conversations, phone conversations, emails, and chat instances should be handled with courtesy and professionalism. Even with the laxx [sic] environment in the fulfillment department, remember that you are at work and it should always be a professional environment. Be aware of your tone of voice, especially in written communication.

Novak further testified that he told Hennig that his "was a supervisor role, so he was an extension of management" and "he needed to hold himself to a high standard." However, this discussion was not documented in writing and Hennig was not issued a verbal warning or reprimand for this incident.

Following this meeting, Money Metals' management decided to monitor Hennig's electronic communications with employees "to ensure that [Hennig] was being professional and implementing the coaching that was given to him . . . ." Two days later, on August 14, 2022, Hennig and a coworker were in the breakroom eating pizza. Hennig later noticed the coworker had not clocked out for lunch and initiated a conversation with him on the company's instant message system. The following exchange occurred:

[Hennig:]     I saw you take an extra slice of pizza, but did you take a lunch [sic] to eat it?

[Coworker:]     Not yet, I ate while I worked but I will still go take a break in a sec
I just wanted to finish some stuff first

| [Hennig:]: | No worries, just making sure |
| [Coworker:] | Thanks [Hennig]! |
| [Hennig:] | I'm paid to be a good little Nazi, so I want to try to be the best little Nazi I can |
| | I probably shouldn't have put that into writing. . . On a work chat |
| | Oh well, they're the ones paying me |
| [coworker]: | Lmao probably not but oh well |

According to Money Metals, this incident was the "last straw" that caused Hennig's discharge. Money Metals deemed Hennig's communication "an unprofessional use of [its] electronic communication system in violation of [company] policy." Money Metals discharged Hennig the following day, on August 15, 2022.

## B. Procedural Background

Hennig subsequently applied for unemployment benefits with the IDOL. The IDOL's personal eligibility determination concluded that Hennig was ineligible for benefits because he was discharged for a violation of company policy. The IDOL notice further stated that Hennig's conduct "fell below the standard of behavior the employer had the right to expect." Therefore, the IDOL determined that Hennig was terminated for employment-related misconduct.

Hennig timely appealed and a telephone hearing was held before an Appeals Examiner for the IDOL. Hennig, Novak, and Donna Davis—Money Metals' controller—testified at the hearing. Novak testified that the text exchange "was the deciding factor" on his termination given his recent conversation with Hennig "about being professional, being an extension of management . . . ." Novak also testified that the text exchange "was by no means professional and is not a reflection of Money Metals Exchange, nor the way that we want [Hennig] to conduct himself." Novak also noted that, after Hennig had sent the message referring to himself as his employer's "good little Nazi," he sent another message "admit[ing] that he shouldn't have sent that" over a work chat, which "[k]ind of acknowledg[ed] that he knows that it was something that he shouldn't have done."

In response, Hennig testified that his messages were taken out of context. Concerning his use of the word "Nazi," Hennig explained that this word was not among the words known to be "universally reprehensible," and instead, the word is commonly used to "express a seemingly unnecessary rigidity in adherence to a particular set of rules or policies":

> As can be seen from the text of the conversation, the messages sent exhibited no anti-Semitism, malice, or ill will of any kind and no offense or

3

discomfort was expressed on behalf of the [co-worker]. In point of fact, as I was being escorted off the premises, we bumped into [co-worker] and he appeared to me to be in good spirits and friendly as usual and his countenance seemed to change to shock when he evidently realized that I was being fired.

There are certainly words in the English language that are known to be universally reprehensible and carry an inherently cruel or cruelty or offense, but Nazi is not among these words, as it is a commonly used term to express a seemingly unnecessary rigidity in adherence to a particular set of rules or policies, especially when referring to an individual who closely watches their peers for any reason.

Hennig also testified that his jovial and unorthodox humor was encouraged by Money Metals throughout his employment because it made him approachable as a manager and made the team feel comfortable:

It would appear to me that management's argument is that I did not handle my conversation with . . . professionalism and I was not . . . aware of my tone of voice. But both of these are untrue. During my original interview for the position with [Money Metals] it was made abundantly clear that management liked my personality and was eager for me to use my sense of humor and levity to keep the team comfortable and ensure that they found me approachable as a manager. Over the course of my employment it was expressed by [Novak] himself on numerous occasions that my jokes, both in person and in writing, were considered a positive and that my sense of humor, even when unorthodox, was clearly not seen as being in conflict with professionalism.

Hennig further testified that Money Metals' enforcement of its communication policy was capricious in this case because Money Metals had promoted a different employee who had repeatedly and intentionally used "highly charged incendiary language" in front of other employees and management. Specifically, Hennig testified that this employee had repeatedly mocked the last name of a client—Baldenegro, pronouncing it "bald-negro"— without any repercussions for the racial slur; and in fact, the employee was subsequently promoted to a supervisor position:

I would like to apologize in advance for the language of this account, but I find it to be very pertinent to this discussion. [Named employee] is another employee in the fulfillment department at [Money Metals] and I and others have on multiple occasions witnessed him share that, quote, the funniest customer name he ever had was a guy named Baldenegro. End quote. When he relates this information he explicitly draws out the names of two words, bald and negro, in a manner in which the racial tone is not even thinly veiled. I have seen him tell the story to an entire room of newly hired employees and I have seen him tell it in [management's] presence. The first time I witnessed [named employee] share this information was when he was still just a packer, but he has since been promoted to a shift lead, in

4

spite of this continued behavior and I have seen him say this again as a shift lead. To my knowledge he still talks about it.

My use of the word Nazi was at worst an unintentional faux pas, but [named employee]'s story is a repeated and intentional use of highly charged incendiary language. To be clear, not only was [named employee]'s language not met with similar repercussions to my own, but, instead, it resulted in his being promoted. This is beyond hypocritical and throws into question whether the company or at least the department actually does abide by their own rules and regulations.

After conducting a de novo review, the Appeals Examiner affirmed the decision of the IDOL. The Appeals Examiner determined that Hennig violated Money Metals' "reasonable interests and standards of behavior that the employer had a right to expect"; thus, Hennig was ineligible for benefits because he was discharged for misconduct.

Thereafter, Hennig appealed to the Commission, arguing that Money Metals failed to carry its burden of proof to establish that he was discharged for misconduct. Hennig argued, among other things, that no written policy was communicated to him because Money Metals failed to produce a signed copy of the policy, which rendered the policy irrelevant. Hennig further argued that Money Metals failed to produce evidence that his use of the word "Nazi" was objectively unprofessional:

Even the most cursory review of media, social norms, and workplace "water cooler chat" reveals that this word is commonly used in precisely the manner use [sic] by Claimant. For example, "My landlord is being a real Nazi because he won't let me have a cat." Or, "Punctuation is very important to me; I consider myself somewhat of a grammar Nazi." Or even, "I saw an episode of Seinfeld last night with the Soup Nazi and that guy is hilarious." The word describes an individual who is overly adherent to a set of rules, especially as those rules pertain to others around the individual.

After conducting a de novo review of the agency record, the Commission affirmed the denial of Hennig's application for benefits and found that he had been discharged for misconduct related to his employment under Idaho Code section 72-1366(5). In support of its decision, the Commission explained that Money Metals' communication policy furthered its interest to ensure a safe work environment and limit liability; and that, as a manager, Hennig's communication "set an unacceptable example" that fell below a standard of behavior that Money Metals was entitled to expect from him:

Employer accuses Claimant of using language in his communication that was completely unacceptable. Employers generally have an interest in ensuring a safe and comfortable working environment. Inappropriate communication in the

5

workplace damages productivity and at worst, exposes a business to litigation. Employer's policy prohibiting [sic] mandating professional behavior in all business communications further [sic] Employer's business interests.

. . . .

. . . Novak stated that as a manager, Claimant was expected to set an example. Claimant's communication over Employer's instant message system set an unacceptable example. Claimant's behavior fell below a standard to which Employer was entitled to expect Claimant's adherence.

(Internal citation omitted.)

The Commission also declined to consider Hennig's testimony that Money Metals selectively enforced its policies based on its promotion of the employee who repeatedly mocked the last name of a client with a racial slur in front of management. Relying on this Court's decision in *Alder v. Mountain States Telephone & Telegraph Co.*, 92 Idaho 506, 512, 446 P.2d 628, 634 (1968), the Commission explained that fairness "[did] not factor into the analysis" because Money Metals demonstrated that Hennig was discharged for misconduct.

Hennig timely appealed the Commission's decision to this Court.

## II.    STANDARDS OF REVIEW

"In appeals from the Commission, this Court's review is limited to questions of law, 'which include whether the Commission's factual findings are supported by substantial and competent evidence and the application of the facts to the law.' " *Shumway v. Evans Chiropractic, PA*, 173 Idaho 226, 230, 541 P.3d 58, 62 (2023) (quoting *Hiatt v. Health Care Idaho Credit Union*, 166 Idaho 286, 290, 458 P.3d 155, 159 (2020)). "Because the Commission is the fact finder, its conclusions on the credibility and weight of the evidence will not be disturbed on appeal unless they are clearly erroneous. This Court does not weigh the evidence or consider whether it would have reached a different conclusion from the evidence presented." *Hiatt*, 166 Idaho at 290, 458 P.3d at 159 (quoting *Ehrlich v. DelRay Maughan, M.D., P.L.L.C.*, 165 Idaho 80, 83, 438 P.3d 777, 780 (2019)). "However, we must set aside the Commission's order where it failed to properly apply the law to the evidence." *Allen v. Partners in Healthcare, Inc.*, 170 Idaho 470, 475, 512 P.3d 1093, 1098 (2022) (citing *Thrall v. St. Luke's Reg'l Med. Ctr.*, 157 Idaho 944, 947, 342 P.3d 656, 659 (2015)).

"When, as here, the employee was separated from employment by a discharge, the employer has the burden of proving that the employee was discharged for employment-related misconduct." *Shumway*, 173 Idaho at 230, 541 P.3d at 62 (first citing *Copper v. Ace*

*Hardware/Sannan, Inc.*, 159 Idaho 638, 641, 365 P.3d 394, 397 (2016); then citing IDAPA 09.01.30.275.01). "The question of whether an employee's behavior constitutes misconduct in connection with employment pursuant to [Idaho Code section 72-1366(5)] is a question of fact, and we will uphold the Commission's determination of this issue if supported by substantial and competent evidence." *Hiatt*, 166 Idaho at 290, 458 P.3d at 159 (quoting *Folks v. Moscow Sch. Dist. No. 281*, 129 Idaho 833, 836, 933 P.2d 642, 645 (1997)). "Substantial evidence is more than a scintilla of proof, but less than a preponderance. It is relevant evidence that a reasonable mind might accept to support a conclusion." *Id.* (quoting *Ehrlich*, 165 Idaho at 83, 438 P.3d at 780). Furthermore "[t]his Court views all the facts and inferences in the light most favorable to the party who prevailed before the Industrial Commission." *Id*. (quoting *Ehrlich*, 165 Idaho at 83, 438 P.3d at 780).

### III.   ANALYSIS

### A.  Hennig's request for judicial notice failed to comply with Idaho Rule of Evidence 201.

As an initial matter, we address Hennig's request for this Court to take judicial notice of certain facts. In his opening brief, Hennig requested that we take judicial notice under Idaho Rule of Evidence 201 that (1) "[t]he internet is rife with self-proclaimed 'grammar nazis' "; and (2) the television show Seinfeld "featured a most memorable character on Season 7, Episode 6, called the 'Soup Nazi.' " Hennig explains that he was comparing himself to the Soup Nazi in his communication with his coworker:

> Said character is still brought up around workplaces today when someone is being a stickler about following the rules. The character had a kiosk in New York where he sold soup. If a potential customer took too long to order or did not order in the manner he wished, he proclaimed[,] "No soup for you!" and ejected them from the line. This is the world in which Claimant grew up. He was comparing himself to people like the Soup Nazi. Nothing more, nothing less.

IDOL objects to Hennig's request, arguing that it would be inappropriate to take judicial notice of any facts because appellate review is limited to the record created below and because this Court is not the factfinder.

This Court may take judicial notice of an adjudicative fact for the first time on appeal. *See State v. Lemmons*, 158 Idaho 971, 978, 354 P.3d 1186, 1193 (2015) (W. Jones, J., concurring). However, we decline to take judicial notice of the matters Hennig identified because his request failed to comply with the requirements of the Idaho Rules of Evidence.

7

"Idaho Rule of Evidence 201 provides the types of facts which a court may judicially notice, as well as the procedure for requesting the court to take judicial notice." *IDHW v. Doe (2023-24)*, 172 Idaho 891, 898, 537 P.3d 1252, 1259 (2023). "Rule 201 pertains only to 'adjudicative facts.' " *Id.* (quoting I.R.E. 201(a)). "An 'adjudicative fact' is a 'controlling or operative fact, rather than a background fact; a fact that concerns the parties to a judicial or administrative proceeding and that helps the court or agency determine how the law applies to those parties.' " *Id.* (quoting *Bass v. Esslinger*, 171 Idaho 699, 704–05, 525 P.3d 737, 742–43 (2023)). Rule 201(b) further describes the adjudicatory facts which may be noticed:

> The court may judicially notice a fact that is not subject to reasonable dispute because it:
>> (1) is generally known within the trial court's jurisdiction; or
>> (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.

I.R.E. 201(b).

Here, Hennig asserts that the facts identified in his request for judicial notice are "easily verifiable." However, Hennig does not contend (nor do we determine) that these facts constitute "adjudicative facts." Put simply, there is no basis to conclude that the existence of the Seinfeld character called the "Soup Nazi," or individuals online who refer to themselves as "grammar Nazis" are "controlling or operative facts" in this case or a fact that "concerns the parties to a judicial or administrative proceeding." Therefore, Hennig's request for judicial notice is denied. Nevertheless, this Court need not take judicial notice of these facts to consider them as a part of his argument addressed below.

**B. The Commission erred as a matter of law when it concluded that Money Metals' expectation for Hennig's behavior was objectively reasonable because it failed to analyze whether Money Metals tolerated the racist remarks of a fellow coworker.**

Hennig contends that the Commission erred when it concluded that Money Metals discharged him for employment-related misconduct. Specifically, he argues that Money Metals failed to establish that: (1) his conduct violated Money Metals' subjective expectations of its employees; (2) his Nazi reference was objectively unreasonable under the circumstances; and (3) Money Metals informed him of its communication policy. Hennig also argues that Money Metals had ignored racist statements made by a coworker in the presence of other employees and

8

management, which undermines Money Metals' contention that it viewed his Nazi reference as unprofessional.

Under the Idaho Employment Security Law, "[c]laimants who have become unemployed through no fault of their own may be entitled to unemployment insurance benefits." *Hiatt*, 166 Idaho at 290, 458 P.3d at 159. If the employee was discharged, which occurred in this case, "the issue is whether the claimant committed some form of employment-related misconduct that would affect his or her ability to receive unemployment benefits under Idaho Code section 72-1366(5)." *Id*. at 290–91, 458 P.3d at 159–60. "The focus of the inquiry is not whether the employer's reason for discharge was reasonable but, rather, whether the misconduct was work-related so as to make the employee ineligible for unemployment benefits." *Shumway*, 173 Idaho at 231, 541 P.3d at 63 (quoting *Adams v. Aspen Water, Inc*., 150 Idaho 408, 413, 247 P.3d 635, 640 (2011)). "Misconduct is defined in three ways: (1) a willful, intentional disregard of the employer's interest; (2) a deliberate violation of the employer's reasonable rules; or (3) a disregard of a standard of behavior which the employer has a right to expect of its employees." *Id*. (citing IDAPA 09.01.30.275.02.a–c).

In this case, the Commission considered all three grounds for misconduct but determined that Hennig was discharged for employment-related misconduct after conducting a "standards of behavior" analysis. "Under the standard[s] of behavior test, the employer must prove, by a preponderance of the evidence, that (1) the employee's conduct fell below the standard of behavior expected by the employer; and (2) the employer's expectations were objectively reasonable under the circumstances." *Hiatt*, 166 Idaho at 291, 458 P.3d at 160 (quoting *Adams*, 150 Idaho at 413, 247 P.3d at 640). "The first condition addresses what the employer *subjectively* expected from the employee, and the second considers whether the employer's expectations are *objectively* reasonable." *Shumway*, 173 Idaho at 231, 541 P.3d at 63 (emphasis in original).

"In order for an employer's expectation to be objectively reasonable, the expectation must be communicated to the employee, unless the expectation is the type that flows naturally from the employment relationship." *Hiatt*, 166 Idaho at 291, 458 P.3d at 160 (quoting *Adams*, 150 Idaho at 413, 247 P.3d at 640). "An expectation flows naturally from the employment relationship when the expectations are common among employees in general or within a particular enterprise." *Adams*, 150 Idaho at 413, 247 P.3d at 640 (citation omitted). "Such expectations are generally

9

limited to fundamental expectations and do not involve specific rules unless clearly embodied in the job at issue." *Id*. (citation omitted).

1. *There is substantial and competent evidence to support the finding that Hennig's conduct fell below Money Metals' subjective expectations.*

Addressing Money Metals' subjective expectations, the Commission found that Money Metals "expects employees to conduct themselves in a professional manner." The Commission determined that Hennig's Nazi reference over Money Metals' message system "set an unacceptable example" which fell below the standard of behavior expected by Money Metals.

Hennig challenges the Commission's finding on this point by insisting that his messages were taken out of context. He explains that when used colloquially, the word "Nazi" can describe "an individual who is overly adherent to a set of rules, especially as those rules pertain to others around the individual":

> Even the most cursory review of media, social norms, and workplace "water cooler chat" reveals that this word is commonly used in precisely the manner used by Claimant. For example, "My landlord is being a real nazi because he won't let me have a cat." Or, "Punctuation is very important to me; I consider myself somewhat of a grammar nazi." Or even, "I saw an episode of Seinfeld last night with the Soup Nazi and that guy is hilarious." The word describes an individual who is overly adherent to a set of rules, especially as those rules pertain to others around the individual.

Hennig's explanation of the intent behind his Nazi reference is plausible, but irrelevant. While a word may have a common colloquial use, this does not mean that the use of the word in a workplace setting is professional. Furthermore, Hennig's subjective intent in making this reference is not at issue. *See* IDAPA 09.01.30.275.02.c. (Under the standards of behavior test, "[t]he claimant's subjective state of mind is irrelevant."). Rather, the first condition of the standards of behavior test addresses what the employer subjectively expected from the employee. *Shumway*, 173 Idaho at 231, 541 P.3d at 63.

The Commission's finding that Hennig's Nazi reference violated Money Metals' subjective expectations of its employees is supported by substantial and competent evidence. Novak testified that, as a supervisor, Hennig was an extension of management and, thus, needed to communicate with professionalism and hold himself to a high standard. Hennig's reference, Novak explained, was unprofessional and did not reflect the way Money Metals wanted Hennig to conduct himself:

[Hennig] was talked to . . . about the communication policy and how to professionally conduct [himself] in the workplace, which is to keep in mind a professional workplace, communicating with . . . overall professionalism with employees and the people around them. [Hennig]'s role was a supervisor role, so he was an extension of management, so he needed to hold himself to a high standard.

. . . .

. . . [S]eeing that conversation with [Hennig] and another employee, that was the deciding factor that we had talked to [Hennig] about being professional, being an extension of management, and about conducting himself in a professional manner and that was by no means professional and is not a reflection of Money Metals Exchange, nor the way that we want him to conduct himself. That is not the case whatsoever.

Given this testimony, the Commission could reasonably conclude that an employee likening himself to being a "good little Nazi"—while performing his supervisory responsibility—fell below Money Metals' subjective expectation for professional communication. Therefore, the Commission's conclusion under the first prong of the standards of behavior test is supported by substantial and competent evidence.

2. *The Commission erred in its analysis of whether Money Metals' expectations were objectively reasonable.*

We next consider whether the Commission erred in its finding on the second prong of the standards of behavior test—that Money Metals' expectations of Hennig's behavior were objectively reasonable. The Commission did not explicitly address this issue in its written decision. However, it appears that the Commission implicitly found that Money Metals' expectations were objectively reasonable based on its acknowledgement of this standard, its discussion of employers' business interests, and its finding that Hennig's behavior fell below a standard that Money Metals "was entitled to expect." The Commission's decision states, in relevant part:

Under the "standards of behavior" analysis, the employer must show by a preponderance of the evidence that it communicated its expectations to the claimant, or that its expectations "flowed normally" from the employment relationship. Further, the employer must demonstrate that those expectations were objectively reasonable as applied to the claimant. As the Idaho Supreme Court has pointed out, an "employer's expectations are ordinarily reasonable only where they have been communicated to the employee." *Folks v. Moscow School District No. 281*, 129 Idaho 833, 838, 933 P.2d 642, 647 (1997).

. . . .

Employer accuses Claimant of using language in his communication that was completely unacceptable. Employers generally have an interest in ensuring a

11

safe and comfortable working environment. Inappropriate communication in the workplace damages productivity and at worst, exposes a business to litigation. Employer's policy prohibiting [sic] mandating professional behavior in all business communications further [sic] Employer's business interests.

. . . .

. . . Claimant argues he was not given an opportunity to correct his behavior before discharge. Novak stated that as a manager, Claimant was expected to set an example. Claimant's communication over Employer's instant message system set an unacceptable example. Claimant's behavior fell below a standard to which Employer was *entitled* to expect Claimant's adherence.

(Emphasis added) (internal citation omitted).

The Commission's statement that Hennig's behavior "fell below a standard to which [Money Metals] was entitled to expect [Hennig]'s adherence" suggests that the Commission found this expectation was objectively reasonable. The Commission's discussion concerning an employer's general interest in ensuring a safe working environment (and reducing inappropriate communication in the workplace) also suggests that Money Metals' expectations concerning professional communications "are common among employees in general[,]" and therefore, flowed naturally from the employment relationship. *Adams*, 150 Idaho at 413, 247 P.3d at 640 (citation omitted). Therefore, the Commission's discussion demonstrates an implicit conclusion that Money Metals' expectation was objectively reasonable because it flowed naturally from the employment relationship.

Hennig raises several challenges to the Commission's finding on this second prong. First, Hennig contends that Money Metals failed to prove that it communicated its expectations to him; thus, its expectations were not objectively reasonable. However, as discussed above, the Commission implicitly determined that Money Metals' expectations of Hennig's behavior were objectively reasonable not because they were actually communicated to Hennig, but instead because its expectations flowed naturally from the employment relationship. "An expectation that flows naturally need not be communicated to an employee to be objectively reasonable." *Shumway*, 173 Idaho at 232, 541 P.3d at 64 (citing *Hiatt*, 166 Idaho at 291, 458 P.3d at 162).

Second, Hennig argues that Money Metals failed to demonstrate that his use of the word "Nazi" was objectively unreasonable or unprofessional. Rather, Hennig contends that the Commission merely presumed this fact:

12

A determination that Claimant was fired for cause ***requires*** a finding that the use of the word "[N]azi," in a joking, self-deprecating manner, in what was believed to be a private conversation with a [co-worker] who understands that it is a joke and in fact *laughs* about it, is objectively unreasonable. No one – ***No one*** provided a sliver of evidence at the hearing that this is the case.

(Emphasis in original.) However, the standards of behavior test did not require the Commission to determine whether *Hennig's conduct* was objectively unreasonable. Instead, "[t]he correct application of the standards of behavior test addresses 'what the employer subjectively expected from the employee' . . . ." and whether the employer's expectations were objectively reasonable. *Shumway*, 173 Idaho at 232, 541 P.3d at 64 (emphasis omitted) (citing *Adams*, 150 Idaho at 413, 247 P.3d at 640).

Nevertheless, "an employer's expectation, even if it flows naturally from the employment relationship, is not objectively reasonable if it is contrary to an established course of conduct." *Adams*, 150 Idaho at 414, 247 P.3d at 641 (citing *Davis v. Howard O. Miller Co.*, 107 Idaho 1092, 1095, 695 P.2d 1231, 1234 (1984)). For example, in *Davis*, this Court held that an employee's act of briefly leaving work without notification did not violate the employer's reasonable expectations because the employer had tolerated the  absences for several months, had failed to express to the employee any disapproval of the conduct, and had not informed the employee that his conduct was not acceptable. *Id.* at 1095, 695 P.2d at 1234. Then, in *Folks v. Moscow School District No. 281*, this Court also determined that a teacher's use of profanity did not violate the employer's reasonable expectations because the teacher and the principal had engaged in a pattern of communication that often included the use of profanity by the teacher. 129 Idaho 833, 838–39, 933 P.2d 642, 647–48 (1997). The Court explained that, through his acquiescence, the principal had led the teacher to believe that her conduct was acceptable and was not inappropriate or unprofessional. *Id.*

Here, the Commission correctly determined that an expectation for employees to communicate with professionalism is the type of expectation that flows naturally from an employment relationship. And while the Commission did not explicitly address the negative connotations associated with the term "Nazi," the Commission's finding that Hennig's reference "set an unacceptable example" suggests that it deemed this reference to be unprofessional based on its historic association with genocide, racism, homophobia, and anti-Catholicism, among other negative connotations.

13

Hennig contends that no evidence supports this finding. We disagree because the Commission could reasonably infer from Hennig's own statements that he knew his Nazi reference violated Money Metals' expectations for professional communication. In the text exchange that led to his termination, Hennig recognized (with his coworker's agreement) that he "probably shouldn't have put" his Nazi reference in writing on a work chat:

[Hennig:]      I saw you take an extra slice of pizza, but did you take a lunch [sic] to eat it?

[Coworker:]      Not yet, I ate while I worked but I will still go take a break in a sec I just wanted to finish some stuff first

[Hennig:]      No worries, just making sure

[Coworker:]      Thanks [Hennig]!

[Hennig:]      I'm paid to be a good little Nazi, so I want to try to be the best little Nazi I can

*I probably shouldn't have put that into writing. . . On a work chat*

Oh well, they're the ones paying me

[coworker]:      Lmao *probably not* but oh well

(Emphasis added.) Thus, Hennig's unprompted acknowledgment that it was a mistake to put this reference on a work chat supports the Commission's implicit conclusion that Money Metals' expectations flowed naturally from its employment relationship.

Even so, we also agree with Hennig that the Commission should have addressed his claim that Money Metals tolerated an employee's repeated mockery of a client's last name with a racial slur. As discussed above, Hennig testified that Money Metals' enforcement of its communications policy was capricious in this case because Money Metals had promoted an employee who had mocked the last name of a client—Baldenegro, pronouncing it "bald-negro"—while management was present:

> I would like to apologize in advance for the language of this account, but I find it to be very pertinent to this discussion. [Named employee] is another employee in the fulfillment department at [Money Metals] and I and others have on multiple occasions witnessed him share that, quote, the funniest customer name he ever had was a guy named Baldenegro. End quote. When he relates this information he explicitly draws out the names of two words, bald and negro, in a manner in which the racial tone is not even thinly veiled. I have seen him tell the story to an entire room of newly hired employees and I have seen him tell it in [management's] presence. The first time I witnessed [named employee] share this information was when he was still just a packer, but he has since been promoted to a shift lead, in

14

spite of this continued behavior and I have seen him say this again as a shift lead. To my knowledge he still talks about it.

>My use of the word Nazi was at worst an unintentional faux pas, but [named employee]'s story is a repeated and intentional use of highly charged incendiary language. To be clear, not only was [named employee]'s language not met with similar repercussions to my own, but, instead, it resulted in his being promoted. This is beyond hypocritical and throws into question whether the company or at least the department actually does abide by their own rules and regulations.

The Commission declined to consider this claim in its analysis of the second prong of the standards of behavior test. Citing this Court's decision in *Alder v. Mountain States Telephone & Telegraph Co*., 92 Idaho 506, 512, 446 P.2d 628, 634 (1968), the Commission stated that it "did not factor" Hennig's belief that he was treated unfairly into its analysis because Metal Moneys had already demonstrated that it had discharged Hennig for misconduct:

>Claimant asserts his discharge was an unfair application of the policy because Employer has not enforced it against others. Claimant cites other employees who repeatedly tell racist jokes who are not only still working for Employer but have been promoted. Novak contends Claimant is unaware of what disciplinary action Employer has taken in other cases. He asserts he does not tolerate such behavior.

>The Idaho Supreme Court has ruled, "it is wholly within the employer's discretion to mete out various forms of discipline for misconduct. This Court has no legal basis upon which it could interfere with the internal disciplinary matters of an employer once employee misconduct has been found. Fairness in these circumstances will not suffice for legal authority." *Alder v. Mountain States Tel. & Tel. Co*., 92 Idaho 506, 512, 446 P.2d 628, 634 (Idaho 1968). In other words, because Employer has demonstrated that Claimant was discharged for misconduct, Claimant's belief that he was treated unfairly in that course of action does not factor into the analysis. Claimant is ineligible for unemployment benefits. Employer's account is not chargeable for experience rating purposes.

(Some internal citations omitted.)

Our holding in *Alder*, however, does not stand for the proposition that an employer's selective enforcement of its policies is irrelevant under a standards of behavior test. Rather, we held that the issue of whether an employer should have chosen a different form of discipline from its available disciplinary measures is wholly irrelevant when considering whether an employee's actions constitute employment-related misconduct:

>The second part of appellants' last legal argument is that Mountain States became subject to a kind of equitable duty to warn the operators to cease their practice before it discharged them. Appellants would have us imply this duty from

15

'equity and fairness.' Though this argument has appeal, we must find it essentially unsound.

This contention is in essence that Mountain States had a legal duty to choose a particular form of discipline from its hierarchy of disciplinary measures. Appellants contend that there was a legal duty to warn them rather than to fine, suspend, discharge or prosecute them, for example. It should be noted preliminarily that this argument is irrelevant to the only issue decided by the Industrial Accident Board below and by this decision, namely, whether appellants were discharged for 'misconduct.' Substantively, however, the argument is faulty because it is wholly within the employer's discretion to mete out various forms of discipline for misconduct. This Court has no legal basis upon which it could interfere with the internal disciplinary matters of an employer once employee misconduct has been found. Fairness in these circumstances will not suffice for legal authority.

*Alder*, 92 Idaho at 512, 446 P.2d at 634 (footnote omitted).

The issue here is not whether Money Metals should have selected an alternative punishment to termination. Rather, it is whether Money Metals' expectation that Hennig not use the word "Nazi" in the workplace was objectively reasonable, given evidence that it tolerated racist comments from another co-worker and then promoted him to a supervisory position. The holding in *Alder* does not suggest that Hennig's allegation that Money Metals selectively enforced its communications policy is irrelevant. As discussed above, "an employer's expectation, even if it flows naturally from the employment relationship, is not objectively reasonable if it is contrary to an established course of conduct." *Adams*, 150 Idaho at 415, 247 P.3d at 642 (citing *Davis*, 107 Idaho at 1095, 695 P.2d at 1234). Thus, Hennig's testimony that Money Metals tolerated the racist comments of a fellow coworker was relevant to whether Money Metals' expectations of Hennig were contrary to an established course of conduct and, thus, called into question whether Money Metals' expectation of Hennig's communication was objectively reasonable.

Furthermore, the Commission also failed to properly analyze Hennig's claim that Money Metals encouraged his jovial and unorthodox humor. In its decision, the Commission disregarded this testimony because Hennig did not cite any examples to support his contention that the word "Nazi" is now commonly used to "mean one who is 'anal' or excessively concerned with rules":

Claimant contends he was hired because Novak liked his irreverent sense of humor and thought it would help with the team. Claimant argues the term "Nazi" is now commonly used in English parlance to mean one who is "anal" or excessively concerned with rules. However, Claimant does not cite any examples to support his contention. Had Claimant used another term such as "soldier" or "enforcer," to make his point with the levity he intended, management may not have taken offense.

16

(Internal citations omitted.)

We disagree with the Commission's analysis on this issue for two reasons. First, the agency record reflects that Hennig *did* provide the Commission with several examples to support his contention that the term "Nazi" is commonly used to refer to someone who is excessively concerned with rules. Similar to Hennig's briefing to this Court, Hennig's briefing to the Commission included a section in which he analogized his Nazi reference to individuals who refer to themselves as "grammar Nazi[s]" or the "Soup Nazi" who appeared in the episode of Seinfeld:

> Even the most cursory review of media, social norms, and workplace "water cooler chat" reveals that this word is commonly used in precisely the manner use [sic] by Claimant. For example, "My landlord is being a real Nazi because he won't let me have a cat." Or, "Punctuation is very important to me; I consider myself somewhat of a grammar Nazi." Or even, "I saw an episode of Seinfeld last night with the Soup Nazi and that guy is hilarious." The word describes an individual who is overly adherent to a set of rules, especially as those rules pertain to others around the individual.

More importantly, even if Hennig had failed to provide these examples to the Commission, this failure is inapposite to the issue of whether Money Metals' expectations of Hennig were "contrary to an established course of conduct" in light of his testimony that Money Metals encouraged his unorthodox humor. *Adams*, 150 Idaho at 414–15, 247 P.3d at 641–42 (citing *Davis*, 107 Idaho at 1095, 695 P.2d at 1234). Regardless of whether Money Metals' expectations flowed naturally from the employment relationship, if Money Metals encouraged Hennig to use irreverent humor when speaking with his coworkers, then Money Metals' expectation of Hennig's communication in this context may not be objectively reasonable, and Hennig may be entitled to unemployment insurance benefits.

"When the Commission has failed to properly analyze an issue, this Court has remanded the matter for further proceedings." *Allen v. Partners in Healthcare, Inc.*, 170 Idaho 470, 478, 512 P.3d 1093, 1101 (2022) (citing *O'Dell v. J.R. Simplot Co.*, 112 Idaho 870, 873, 736 P.2d 1324, 1327 (1987)). Here, the Commission did not analyze whether Money Metals' expectations were reasonable in light of Hennig's claim that it had established a contrary course of conduct by: (1) selectively enforcing its communication policy, and (2) encouraging his jovial and unorthodox humor. Therefore, we reverse the Commission's decision and remand so the Commission can conduct that analysis.

## IV. CONCLUSION

For the above reasons, we reverse the Commission's decision and remand this matter for further proceedings before the Commission. Hennig is awarded costs on appeal pursuant to Idaho Appellate Rule 40.

Chief Justice BEVAN, and Justices MOELLER, ZAHN and MEYER CONCUR.